OPINION
{¶ 1} This is an appeal by plaintiff-appellant, Peter R. Thomas, from a judgment of the Franklin County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, American Electric Power Company ("AEP"), American Electric Power Service Corporation, and AEP Communications, Inc. ("AEPC"), on appellant's breach of contract claim.
 {¶ 2} Appellant began employment with AEP in August of 1996, and continued working with the company until his termination in January of 2002. At the time of his termination, appellant held the title of vice-president of AEPC, a telecommunications subsidiary of AEP. AEPC was comprised of several different business units, identified as (1) the Fiber Business unit; (2) the Wireless Business unit; (3) the Energy Information Services ("EIS") unit; and (4) the Personal Communications Services ("PCS") unit.
 {¶ 3} In 1999, AEP adopted a long-term incentive compensation plan for executives of AEPC, entitled the AEPC "Phantom Equity Plan" ("the Plan"). The stated purpose of the Plan was to "motivate and retain key personnel for AEP Communications, Inc. by providing competitive, long-term, performance-driven incentive compensation and to provide a mechanism for such individuals to benefit for creating value for AEP Communications." (Plaintiff's Exhibit No. 3.) The Plan had overlapping three-year "Performance Periods," with the first Performance Period beginning on January 1, 1999, and ending on December 31, 2001.
 {¶ 4} Pursuant to an "award letter," dated January 12, 2000, appellant was "granted 4,956 Phantom Stock Units" in AEPC for the 1999 Performance Period. (Plaintiff's Exhibit No. 3.) According to the award letter, the Plan was "designed to require improvement in Market Value Added or MVA in order to receive an award." Because AEPC was not a publicly traded company, an independent consultant (the William Mercer Company) established the initial market value added ("MVA") at $123.6 million, and the stock units were assigned "a hypothetical price of $12.36 for a total valuation of $61,250." (Plaintiff's Exhibit No. 3.) Pursuant to the Plan, AEP was to make cash payouts to participants within 90 days after the end of each Performance Period.
 {¶ 5} An attachment to the award letter identified "value drivers" for each of the business units. The value drivers for the Fiber Business unit consisted of "Fiber Miles and PPE" (property, plant and equipment), valued at $107.4 million as of December 31, 1998. The value driver for the Wireless Business unit was "Shareholder Cash Flow" (valued at $2.8 million), while the value driver for the EIS unit was "Unlevered Cash Flow (valued at $5 million), and the value driver for the PCS unit was "Peer Group Median Multiple of Market Value to Invested Capital" (valued at $8.4 million).
 {¶ 6} A copy of the Plan was attached to the award letter. The Plan included the following definitional language:
1.1 "Award Letter" means a certificate setting forth the terms and conditions applicable to each grant of a Phantom Stock Unit, which shall include, but not be limited to, the Participant's Award Level and the performance measures for the Performance Period of the grant.
1.2 "Award Level" means the number of Phantom Stock Units granted to a Participant at the commencement of a Performance Period.
1.3 "Committee" means the individuals holding the following offices within American Electric Power Service Corporation; Chairman of the Board, President and Chief Executive Officer; Executive Vice President — Corporate Development; Executive Vice President — Financial Services; Executive Vice President — Corporate Services; Senior Vice President — Human Resources; and Vice President — Communications.
* * *
1.11 "Market Value" means the value of the Company as of each Valuation Date, which shall include the value of the Company's Fiber business unit, Wireless business unit, EIS business and the PCS business unit.
1.12 "Market Value Added" means the Market Value of the Company less Invested Capital as of the Valuation Date.
* * *
1.14 "Performance Period" means the three year period commencing on January 1 of year one and ending on December 31 of year three.
1.15 "Phantom Stock Price" means the Market Value Added divided by ten million, the assumed number of authorized and issue[d] Phantom Stock Units.
* * *
1.19 "Target Market Value" means the Market Value Added at the commencement of the Performance Period increased at a rate equal to the Cost of Capital over the three-year Performance Period.
 {¶ 7} Article III of the 1999 Plan, designated "Determination and Payment," provided as follows:
3.1 If the Market Value Added at the end of the Performance Period equals the Target Market Value for the Performance Period and does not exceed the sum of the Target Market Value at the end of the Performance Period plus the sum of four times the Market Value Added as of the commencement of the Performance Period, the Phantom Stock Units shall be redeemed at the Phantom Stock Price determined as of the end of the Performance Period.
3.2 If the Market Value Added at the end of the Performance Period exceeds the Target Market Value at the end of the Performance Period plus the sum of four times the Market Value Added as of the commencement of the Performance Period, the portion of the Phantom Stock Price in excess limitation shall not be paid to the Participant but shall be reinvested in Phantom Stock Units for the next following Performance Period. The number of Phantom Stock Units acquired for the next following Performance Period shall be determined by dividing the excess amount by the Phantom Stock Price of the Phantom Stock Units at the commencement of the following Performance Period.
3.3 If the Market Value Added at the end of the Performance Period equals the Market Value Added as of the commencement of the Performance Period, the Phantom Stock Units shall be redeemed at 50% of the Phantom Stock Price determined as of the end of the Performance Period. If the Market Value Added at the end of the Performance Period is greater than the Market Value Added as of the commencement of the Performance Period and less than the Target Market Value for the Performance Period, the percentage at which the Phantom Stock Price is redeemed shall be determined by interpolation. If the Market Value Added at the end of the Performance Period is less than the Market Value Added at the commencement of the Performance Period and is not less than zero, the percentage at which the Phantom Stock Price is redeemed shall be determined by interpolation.
3.4 The redeemed Phantom Stock Units shall be paid in cash to the Participant within 90 days after the end of the Performance Period. All payments shall be subject to the applicable federal, state and local income tax withholding requirements and to the applicable Social Security and Medicare tax withholding requirements.
 {¶ 8} Article V, Section 5.1 of the Plan provided that "[t]he Committee shall administer the Plan and shall have the authority to interpret the Plan and to prescribe, amend and rescind rules and regulations relating to the administration of the Plan, and all such interpretations, rules and regulations shall be conclusive and binding on all Participants."
 {¶ 9} Article VI, Section 6.1 stated as follows:
The Committee shall have the right, authority and power to alter, amend, modify, revoke or terminate the Plan; provided that no amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to Phantom Stock Grants that have been awarded prior to the amendment or termination of the Plan.
 {¶ 10} In addition to the award letter of January 2000, appellant also received an award letter dated July 31, 2000, in which AEP informed him that he was selected as a participant in the 2000 AEP phantom equity plan. According to that letter, effective January 1, 2000, appellant was granted 6,479 Phantom Stock Units "at a hypothetical price of $25.08, for a total valuation of $162,493.32." (Plaintiff's Exhibit No. 4.)
 {¶ 11} Shortly after those award letters were issued, the telecommunications industry experienced a sharp economic downturn, and AEP subsequently interpreted the Plan to not require any payout for either the 1999 or the 2000 Performance Periods. On December 12, 2001, AEPC terminated appellant's employment, effective January 31, 2002.
 {¶ 12} On June 14, 2002, appellant filed a complaint against appellees, alleging causes of action for breach of contract and promissory estoppel. On September 15, 2003, appellees filed a motion for summary judgment. On September 30, 2003, appellant filed a memorandum contra appellees' motion for summary judgment.
 {¶ 13} By decision and entry filed October 29, 2003, the trial court granted summary judgment in favor of appellees as to appellant's cause of action for breach of contract claim, while denying summary judgment as to appellant's promissory estoppel claim. By entry filed December 1, 2003, the trial court dismissed, without prejudice, appellant's claim for promissory estoppel.
 {¶ 14} On appeal, appellant sets forth the following assignment of error for review:
The trial court erred in granting summary judgment for defendants-appellees on plaintiff-appellant's breach of contract claim.
 {¶ 15} In Roberts v. Performance Site Mgmt., Inc., Franklin App. No. 03AP-784, 2004-Ohio-2820, at ¶ 8-9, this court delineated the standard of review for summary judgment as follows:
An appellate court's review of summary judgment is conducted under a de novo standard. * * * Summary judgment is proper only when the movant demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. * * *
Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. * * * Once the moving party discharges its initial burden, summary judgment is appropriate if the non-moving party does not respond, by affidavit or otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. * * *
 {¶ 16} In the present case, the trial court, in granting summary judgment in favor of appellees as to appellant's breach of contract claim, determined that AEP's promises under the Plan were illusory, and, therefore, the Plan was unenforceable. In so holding, the court relied upon two decisions from this court, Quesnell v. Bank One Corp. (Apr. 4, 2002), Franklin App. No. 01AP-792, and Kulas v. Bank One Trust Co.,
Franklin App. No. 01AP-1290, 2002-Ohio-5002.
 {¶ 17} Because of the trial court's reliance upon the above authorities, we begin with a review of those cases. In Quesnell, the defendant, Bank One Corporation ("Bank One"), employed the plaintiff as a relationship manager for the company's cemetery trust related business, and plaintiff was compensated through a base salary and an incentive plan that paid her quarterly based upon a percentage of projected fees on new business brought into the bank. Bank One's 1998 Relationship Manager Incentive Compensation Plan provided in part:
This Plan may be modified, amended or terminated at any time by the Banc One Investment Management Group. The existence of the Plan does not obligate the Banc One Investment Management Group to pay an award to any participant (or beneficiary) nor does the participant (or beneficiary) attain any vested right to forfeit an award until the award has been finalized and approved for payment.
 {¶ 18} In August of 1998, Bank One terminated plaintiff, and she subsequently filed a breach of contract action. The trial court granted summary judgment in favor of Bank One on plaintiff's contract claims, holding that the 1998 Relationship Manager Incentive Compensation Plan gave Bank One the unlimited right to determine the nature or extent of the performance, and, therefore, any promise to pay incentive under a written contract or oral contract was illusory.
 {¶ 19} On appeal, plaintiff challenged the trial court's finding that any written or oral contracts between her and Bank One were illusory. InQuesnell, this court affirmed the ruling of the trial court, finding in pertinent part:
We agree with the trial court that the foregoing language provided Bank One with an unlimited right to determine the nature or the extent of its performance. As such, the oral promise of Mike Daniel, that as long as Quesnell remained a relationship manager she would be eligible under the relationship manager program, is merely illusory because such a promise incorporates the Relationship Manager Incentive Plan that gives Bank One the unlimited right to withhold payment. * * *
 {¶ 20} Under the facts of Kulas, supra, the plaintiff, also a Bank One employee, managed a team of sales people and marketed Bank One's corporate trust products and document custody services. Shortly after he began his employment, Bank One initiated a plan that paid plaintiff and other sales executives incentive compensation, establishing a new incentive plan at the beginning of each calendar year. Under the terms of the plan, all "award payments" were subject to approval by the senior managing director of sales and the Investment Management Compensation Committee. Further, the plan provided: "At any time this plan may be modified, amended [or] terminated. No amendment, modification, or termination of the plan, shall in any manner adversely impact any award therefore entered under the plan. Such amendment, or termination may be made without consent of the participants." Kulas, supra, at ¶ 20.
 {¶ 21} In 1995, plaintiff entered into negotiations with Chase Manhattan Bank ("Chase") to secure Chase's document custody business. In 1996, a formal contract between Bank One and Chase was executed, and according to plaintiff's projections, the Chase transaction would generate $3 million in fees for Bank One. Plaintiff expected to receive $1.25 million in incentive compensation under the 1996 plan, but he received only $500,000. According to plaintiff's supervisor, the 1996 plan was modified in May of 1996 to include a provision that any single transaction for the year would be limited to a payout amount of $500,000.
 {¶ 22} Plaintiff subsequently brought an action against Bank One, alleging breach of contract under the plan for Bank One's refusal to pay him the full amount of the executive compensation regarding the Chase transaction. The trial court granted Bank One's motion for summary judgment, finding that the provisions of the plan vested unfettered discretion in Bank One to determine the nature or extent of its performance.
 {¶ 23} On appeal, this court affirmed, relying upon the decision inQuesnell, supra, and holding in part:
In Quesnell * * * this court * * * determined that the language contained in the 1998 Plan permitting Bank One to modify, amend or terminate the plan at any time and to disavow any obligation to pay an incentive award to any participant rendered the contract illusory and thus unenforceable. Plaintiff argues that Quesnell is not applicable to the 1996 Plan because that plan contained additional language stating that "[n]o amendment, modification, or termination of the plan, shall in any manner adversely impact an award therefor[e] earned under the plan." Plaintiff suggests that this language somehow nullifies the illusory nature of the contract. We do not agree. This language merely provides that once an award has been approved, no amendment, modification or termination of the plan may adversely impact such award.
Further, as noted by the trial court, the plans contain other language which clearly establishes the illusory nature of the contracts. In addition to maintaining the right to amend, modify or terminate the plan at any time, defendant is vested with the unfettered discretion to revoke an employee's participation at any time, to determine which employees have the privilege of participating in the plan, to determine which generated fees will contribute to award eligibility, to determine the ultimate amount of any award, and to determine whether any incentive compensation will be paid at all. * * *
Kulas, at ¶ 40-41.
 {¶ 24} In the instant case, the trial court, in its October 29, 2003 decision granting summary judgment in favor of appellees, held in part:
A careful comparison of Section 6.1 to the language employed by Bank One in its incentive plans, reveals that the language in this Plan is the same as the first two sentences of the terminology used by Bank One with Kulas. The third sentence of the Kulas discretionary clause, which reads, "such amendment or termination may be made without consent of the participants," is the functional equivalent of Section 5.1 of Thomas' Plan with AEP. Both 5.1 and the third sentence of Kulas reserve sole authority to make revisions in the Plan Committee and negate the need for any participant authority. Thus, a comparison of the Thomas/AEP Plan and the first three sentences of the Kulas/Bank One Plan leads this court to conclude that the terms are the same. Consequently, the result should be the same: the Thomas/AEP Plan is illusory and unenforceable, just like the Kulas Plan was.
But, the interpretation is not quite that simple. The Kulas Plan contains a final, fourth sentence, which reads: ["]The existence of the plan does not obligate the Institutional Sales Group Head or the company to pay an award to any participant (or beneficiary), nor does any participant (or beneficiary) attain any vested right to an award until the award has been finalized and approved for payment." Thus, the Court must decide whether the inclusion of this final sentence in the Kulas Plan distinguishes it from the Thomas/AEP Plan. Absent this fourth sentence, would the Kulas Plan still have been illusory? Or, is it this final reservation that explicitly removes any obligation to pay that made the Kulas and Quesnell Plans illusory?
* * * [T]he Court finds that AEP's promise to reward its executives is illusory. The Court finds that the reservation of authority in Section 6.1 destroys AEP's promise to reward employees for creating value in AEPC. The discretionary clause allows the Plan Committee to change, adjust and/or terminate the incentive program at any time prior to the award of stock grants for any reason and without prior notice to the Plan Participants. Essentially, the provision permits AEP to determine if it will actually perform under the Plan. Such a promise is no promise at all. Thus, the Court finds that AEP's promises under the Phantom Equity Plan are illusory and the Plan is unenforceable. * * *
 {¶ 25} Following the trial court's decision granting summary judgment in favor of appellees, appellant filed a motion for reconsideration. In that motion, appellant argued that the contract was not illusory because AEP awarded him a grant of Phantom Stock Units at the beginning of the three-year Performance Period and, therefore, under Section 6.1 of the Plan, any amendments to or termination of the Plan could not adversely affect a participant's rights with respect to those previously awarded stock grants.
 {¶ 26} The trial court, in addressing the motion for reconsideration, rejected this argument, holding in relevant part:
This arguably distinguishes this case from the facts in Quesnell andKulas. In both of those cases, the incentive plans consisted of percentage based bonuses. Neither Quesnell nor Kulas received an "award" in the form of "phantom stock grants" at the outset of the plan, like Pete Thomas did. Id. Thus, the real issue that determines the outcome is whether this factual distinction is one of consequence. Does the grant of "phantom stock units" to Pete Thomas distinguish this Plan from those inQuesnell and Kulas to the extent that AEPC's promises are not illusory?
After reviewing the Plan and letter, the Court finds that AEPC did not award and/or grant the Plaintiff anything that overrode AEPC's unlimited right to determine the nature or extent of its performance. The Court reaches this conclusion first and foremost based upon its reading of the last full paragraph of the January 12, 2000 letter. That paragraph tells the Plaintiff that "[a]wards earned under the plan at the end of the performance period will be determined on how well AEPC increased its MVA." The Court finds it significant that awards are not earned until the performance period ends. It did not say that awards may be "redeemed" at the end of the performance period. * * *
Further, the units that AEPC "granted" to Pete Thomas are illusory in and of themselves. AEPC even admits as much when they refer to them as "phantom" on the last line of the January 12, 2000 letter. * * * The units were of no value when the letter was sent. This is evidenced by the assignment of a "hypothetical price" of $12.36. Monetary value was not "locked in" or attributed until the performance period ended. In this respect, Pete Thomas received no more than Kulas nor Quesnell received. All three plaintiffs had to wait until the end of the plan period before receiving financial reward for their efforts. In the interim, their employers were free to alter, revoke or terminate the plan. Such unilateral authority effectively destroyed the employers' promises to award achievement. Such is the case here. Therefore the Court confirms its decision that the Plan created an illusory promise and thus an unenforceable contract.
(Footnote omitted; Emphasis sic.)
 {¶ 27} On appeal, appellant contends that Quesnell and Kulas are not dispositive, as in those cases, the plans contained blanket unqualified language providing that each plan may be "modified, amended or terminatedat any time." (Emphasis added.) Appellant further argues that, in those cases, Bank One was not obligated to pay any award "until the award has been finalized and approved for payment." In contrast, appellant maintains, under the Plan at issue in the instant case it is the award of phantom stock grants that fixes AEP's obligations with respect to those grants (i.e., the units granted pursuant to the award letters, effective January 1, 1999 and January 1, 2000) as opposed to the "earning" or "vesting" of awards in the sense of payouts made.
 {¶ 28} In response, appellees urge, as the trial court found, that the award letters specifically equated "award" with payment at the end of the Performance Period, and that no phantom stock grants had been "awarded" as of December 2001. In support, appellees point to representations in the award letter, including language that the plan was designed to require improvement in MVA "in order to receive an award."
 {¶ 29} Appellees also raise the argument, for the first time on appeal, that the terms "revoke" and "terminate" are not synonymous, and, therefore, the limitation on the Committee's ability to "terminate" the Plan, under Section 6.1, had absolutely no influence on the Committee's ability to "revoke" the Plan; appellees maintain that this unfettered discretion to revoke the Plan renders it illusory.
 {¶ 30} In general, "[t]he interpretation of written contracts, including any assessment as to whether a contract is ambiguous, is a question of law subject to de novo review on appeal." Watkins v.Williams, Summit App. No. Civ.A. 22162, 2004-Ohio-7171, at ¶ 23. If a contract is unambiguous, its interpretation is a matter of law not requiring factual determinations; however, if an ambiguity exists, interpretation of the contract requires both factual and legal questions. Id. Further, "[w]here that ambiguity is coupled with a material issue of fact supported by proper evidentiary materials, summary judgment is improper." Id.
 {¶ 31} Under Ohio law, a court must give meaning to all provisions of a contract if possible, and "`common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument.'" CustomDesign Tech., Inc. v. Galt Alloys, Inc. (Jan. 7, 2002), Stark App. No. 2001CA00153, quoting Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, 245-246.
 {¶ 32} A contract is illusory when, by its terms, the promisor "retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." Century 21 v. McIntyre (1980),68 Ohio App.2d 126, 129-130, citing 1 Williston on Contracts (3 Ed. 1957) 140, Section 43. In general, when construing an agreement, courts disfavor interpretations that render contracts illusory or unenforceable, and prefer a meaning, which gives the contract vitality.Talbert v. Continental Cas. Co., 157 Ohio App.3d 469, 2004-Ohio-2608, at ¶ 9.
 {¶ 33} We will first consider appellees' contention that the Plan was illusory based upon the argument that the terms "revoke" and "terminate" have a different meaning under the language of the Plan. As noted, appellees did not raise this argument before the trial court, but now assert that, even though the "subordinate clause" of Section 6.1 prohibits the Committee from amending or terminating the Plan in a way that adversely affects the right of any participate with respect to phantom stock grants awarded prior to such termination or amendment, the language in the first part of Section 6.1 does not prohibit the Committee from choosing to "revoke," "alter" or "modify" the Plan with regard to previously awarded Phantom Stock Units. Appellees thus argue that the committee had unfettered discretion to revoke the Plan with respect to those grants.
 {¶ 34} While the terms "revoke" and "terminate" may not generally be synonymous, in considering the context of the contractual language at issue, we do not find that general proposition to be controlling. One federal court has observed: "The word `terminate' * * * may be used in two different ways. As an intransitive verb, it means, to come to an end or to expire; as a transitive verb, it means, to bring to an end, to cancel or to eliminate. * * * [I]n its transitive sense, * * * it becomes synonymous with `revoke,' `cancel' or `eliminate.'" Pan American WorldAirways, Inc. v. Boyd (D.D.C. 1962), 207 F.Supp. 152, 157.
 {¶ 35} In the instant case, Section 6.1 employs the words to "terminate" or "revoke" in the transitive, or active, sense, i.e., authorizing the Committee to bring to an end or cancel the Plan. As used in that context, we find persuasive the Boyd court's reasoning that the word "terminate" becomes "synonymous with `revoke,' `cancel,' or `eliminate.'" Boyd, supra, at 157. See, also, Grant v. Aerodraulics Co.
(1949), 91 Cal.App.2d 68, 73 (words "terminate," "revoke" and "cancel," as used in context of written agreement, "all have the same meaning, namely, the abrogation of so much of the contract as might remain executory at the time notice is given"). Based upon the foregoing, appellees' contention that the general distinction between "terminate" and "revoke" renders the Plan illusory is not well-taken.
 {¶ 36} We next consider the basis for the trial court's conclusion that the Plan is illusory. As noted, the language of Section 6.1 precludes AEP from any type of amendment or termination of the Plan that would "adversely affect the rights of any Participant with respect to Phantom Stock Grants that have been awarded prior to the amendment or termination of the Plan." In considering the above provision, the trial court found that AEP reserved the right to amend or terminate the Plan with respect to previously granted Phantom Stock Units until payouts were made at the end of a Performance Period. Specifically, the court reasoned, "monetary value was not `locked in' or attributed until the performance period ended."
 {¶ 37} Contrary to the trial court, we do not construe Section 6.1 of the Plan to unambiguously mean that AEP had the absolute or unlimited discretion to amend or terminate the Plan until monetary value was "locked in" at the end of the Performance Period. Section 1.1 defines "Award Letter" as "a certificate setting forth the terms and conditions applicable to each grant of a Phantom Stock Unit, which shall include, but not be limited to, the Participant's Award Level and the performance measures for the Performance Period of the grant." A reasonable interpretation of the Plan, as advanced by appellant, is that AEP, by virtue of the award letter dated January 12, 2000, "awarded" a total of 4,956 phantom stock unit grants to appellant at that time (as an incentive to retain a key employee and to motivate that employee to grow the value of the company). Assuming that this was the intent of the Plan, we would agree with appellant that the crucial point, for purposes of construing the reservation of rights clause, is the award of phantom stock unit grants (via the award letters) at the beginning of the Performance Period, rather than the determination of the amount of payouts at the end of that period.[1]
 {¶ 38} Further, if the language of the Plan contemplated that appellant was "awarded" phantom stock unit grants at the time the letters were issued then, based upon the limiting language of Section 6.1, payment as to those previously awarded Phantom Stock Units (in contrast to the facts of Kulas and Quesnell) was not discretionary, and AEP's reserved power to amend would not render such promise illusory. SeeDawson v. E Z Auto Sales, Inc. (Dec. 10, 1993), Lake App. No. 92-L-177 ("a party's limited power of termination does not render an agreement illusory"); Local 3-7, Internatl. Woodworkers of America v. Daw ForestProducts Co. (C.A.9, 1987), 833 F.2d 789, 796 ("Where the terms of a promise limit the promisor's future freedom of choice, such that the promisor's future action is not left to `his own future will,' the promise is not illusory").
 {¶ 39} Here, the reservation of rights clause is susceptible to more than one reasonable interpretation, and we find that appellant's interpretation is as equally plausible as appellees' interpretation. Because reasonable persons could reach different conclusions about the meaning of the Plan's ambiguous language, it is for the fact finder to resolve such ambiguity. See Charles Gruenspan Co. v. Thompson, Cuyahoga App. No. 80748, 2003-Ohio-3641, at ¶ 74 ("where the language of a contract is reasonably susceptible to more than one interpretation, the meaning of ambiguous language is a question of fact"). Further, when a court finds an ambiguity in a contract, it may look to extrinsic evidence to determine the parties' intent. Ritchie's Food Distributor, Inc. v.Refrigerated Constr. Serv., Inc., Pike App. No. 03CA713, 2004-Ohio-2261, at ¶ 12.
 {¶ 40} Appellees argue, alternatively, that, even if this court were to find the Plan language not illusory, we should nevertheless affirm the trial court's grant of summary judgment on the breach of contract claim because, under the express terms of the Plan, no payment was required. More specifically, appellees contend that appellant's breach of contract claim fails based upon failure of a condition precedent. Appellees argue that the intent of the Plan was to reward participants only if AEPC's market value exceeded the amount of invested capital. Appellees assert, however, that MVA, as of December 2001, was a negative number, and, therefore, the inability to secure a positive MVA for AEPC at the close of the 1999 Performance Period was a failure of a condition precedent. Appellees further point to the language in Section 5.1 of the Plan as affording the plan Committee wide discretion in determining whether value had been added.
 {¶ 41} In response, appellant maintains that, based upon the value drivers AEP determined from the outset would be used to calculate MVA, the telecommunication company's MVA actually increased over the relevant time period. Specifically, appellant asserts that it was the intention of both the Plan designers and AEP management that the same valuation methodology used to establish the beginning MVA for each of AEPC's business units for the 1999 Performance Period (on January 1, 1999) was also to be used to establish the ending MVA for that business unit for the 1999 Performance Period on December 31, 2001. Appellant further noted before the trial court, in his memorandum contra appellees' motion for summary judgment, that the Plan does not contain an integration clause, and that it references terms outside the Plan document.
 {¶ 42} The trial court, in finding that the Plan was illusory, never addressed these issues. Upon review, we agree with appellant that genuine issues of fact remain as to whether AEP intended or agreed, at the inception of the Plan, to use the same value drivers, regression coefficients, and formulas to calculate both the beginning and ending values for MVA for a given Performance Period, or whether AEP was free to ignore the methodology used at the beginning of the applicable Performance Period and select any other method to determine ending MVA. The Plan itself is unclear on this issue (and the addendum to the award letter only identifies the value drivers utilized to calculate the beginning MVA). However, appellant has submitted evidentiary materials, including parol evidence, raising questions of fact as to whether AEP's intent was to use the same valuation methodology for both the beginning and ending MVA for each Performance Period, and those evidentiary materials conflict with appellees' assertion that AEP had no intention of utilizing a fixed formula to determine MVA at the close of a Performance Period. Here, reasonable minds could reach different conclusions as to the proper methodology for calculating MVA under the Plan and, ultimately, whether the company experienced an increase in MVA during the relevant period.
 {¶ 43} As noted, appellees further contend that Section 5.1 afforded the Committee essentially unbridled discretion in interpreting the Plan. However, even assuming that the Plan's intent was for the Committee to determine MVA under any method it chose (and further assuming that appellant's reading of the Plan is ultimately correct, i.e., that phantom stock unit grants were "awarded" to him prior to any amendment or termination of the Plan), issues of fact would still remain as to whether AEP's administration of the Plan was exercised in good faith. Hainlinev. Gen. Motors Corp. (C.A.6, 1971), 444 F.2d 1250, 1257 (recognizing that "when an executive committee is vested with the authority to terminate rights in a bonus, pension, or other similar plan, upon a factual determination such as voluntariness, it is bound to exercise its authority honestly and in good faith"). See, also, Holderman v.Huntington Leasing Co. (1984), 19 Ohio App.3d 132.
 {¶ 44} In the present case, because genuine issues of material fact remain, the trial court erred in granting summary judgment in favor of appellees. Accordingly, appellant's single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
Petree and Sadler, JJ., concur.
[1] In contrast to the trial court, we do not find significant the fact that, under the Plan, "phantom" shares are assigned a "hypothetical" price at the outset. By their nature, "[p]hantom stock plans provide payments based on hypothetical investments in company stock," whereby executives are typically "granted units that are assigned a value based on the fair market value of one share of company stock on the date of the grant," and "[f]uture payments can be based on future appreciation or on initial value plus future appreciation." 2 Compensation and Benefits (West 2005) § 10:10. See, also, Emmenegger v. Bull Moose Tube Co.
(E.D.Mo. 1998), 13 F.Supp.2d 980, 982 (Under a Phantom Stock Plan, "ownership of so-called `phantom' shares is not evidenced by certificates. However, like actual stock, the value of a phantom share is tied to the company's performance"), affirmed in part, vacated in part on other grounds, 197 F.3d 929 (C.A.8, 1999). In the present case, although AEP was not a publicly traded company, an initial "Phantom Stock Price" was set for the units as if traded publicly, pursuant to Section 1.15, i.e., "Phantom Stock Price" was defined to mean "the Market Value Added divided by ten million, the assumed number of authorized and issue[d] Phantom Stock Units." Further, Article III delineated the exact manner of calculating the price at which the shares were to be redeemed upon the advent of any of the possible MVA progression scenarios.