OPINION *Page 2 
{¶ 1} This is a consolidated appeal brought by three former executive employees of American Electric Power, Inc. (hereafter "AEPES"), a separately incorporated, wholly-owned subsidiary of American Electric Power Company (hereafter "AEP," and collectively "AEP"). The former employees brought claims against AEP for breach of contract, fraud, unjust enrichment, promissory estoppel, and quantum meruit after their former employer failed to pay incentives allegedly owed to them for services performed prior to their leaving AEPES in 2002/2003.[1] AEPES moved for summary judgment and, on August 23, 2006, the trial court granted the motion as to all claims except one. Appellant James Shrewsbury (hereafter "Shrewsbury") dismissed the remaining claim with prejudice, and this appeal ensued.
 {¶ 2} AEP, the parent corporation in this case, created AEPES in 1997 to be a wholesale marketing and trading subsidiary for natural gas and other related products and services. Since its emergence, the energy trading industry has been extremely profitable, resulting in certain energy traders and executives earning multi-million dollar bonuses.
 {¶ 3} AEPES hired Shrewsbury and Joseph Sestak (hereafter "Sestak") in the fall of 1997. Both Shrewsbury and Sestak left their previous jobs to join AEPES as energy traders at an initial salary of $105,000 annually, plus incentives. It was understood that their base salary was to comprise only a small part of their compensation, and incentive packages would substantially bolster their annual base salaries. Shrewsbury and Sestak were each given employment contracts. Shrewsbury's contract expired on October 20, *Page 3 
1999 (Shrewsbury Depo., exhibit C), and he continued to work without a contract. Sestak signed a new contract in June 2000, which expired on May 31, 2002, and he also continued to work without a contract.
 {¶ 4} AEPES hired appellant, Carey M. Metz (hereafter "Metz") in February 2001, after AEP acquired Metz's former employer, Houston Pipeline, from Enron. Metz assumed the position of director of energy marketing and trading at AEPES, at an annual base salary of $125,000, plus incentives. Metz's two-year employment contract with AEPES was to run from March 2001 to March 2003.
 {¶ 5} AEPES's incentive compensation plan ("ICP" or "plan") was first adopted in 1997. This plan created an "annual bonus pool" comprised of 15 percent of AEPES's yearly pre-tax operating income. At the end of the year, AEPES distributed the proceeds from the plan to eligible employees. The amount of profits generated by the traders formed the basis of the allocation of the awards. However, the plan provided for the president of AEPES and the compensation committee to have complete control over how the funds were allocated. The ICP also contained language reserving the right to alter, amend, modify, revoke, or terminate the plan, with the proviso in section 7.1 specifying that "no amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to earned but unpaid Incentive Compensation awards." Notably, drafts of a potential new incentive compensation plan circulating at the time of Shrewsbury's and Sestek's termination took this provision out. Also, nowhere in the plan is the term "earned" defined. Finally, Section 5.2 of the plan required participants to be employed on the last day of the plan year (December 31st) to earn an incentive award. *Page 4 
 {¶ 6} The ICP provided substantial payouts to its participants. For example, Shrewsbury received more than $1.5 million in 2002 from his services in 2001. Sestak received more than $500,000 from the plan during that same period. Metz received a payout for 2001 of $2,800,000. After deciding to downsize the energy trading aspect of its business, AEP made a decision in the last quarter of 2002 to terminate the ICP. Officially, the ICP was terminated December 10, 2002 by an act of the plan committee. Despite the termination of the official plan, management decided to allocate the approximate value of the bonus pool as of September 30, 2002 ($21.9 million) to various individuals. However, none of the appellants received payouts for the work they performed in 2002 which generated large profits for AEP.
 {¶ 7} In addition to the ICP, AEPES also offered a long-term incentive plan, known as the "Phantom Equity Plan" ("PEP"). The PEP's stated purpose was to "enhance shareholder value, and provide participants with an equity participation sufficient to attract, motivate and retain qualified employees." (Letter from AEP to Shrewsbury, March 23, 1999.) The PEP was also instituted in 1997, and terminated by its own terms in June 2002. Shrewsbury and Sestak each received $1,500,000 from the PEP (Shrewsbury Depo., at 33; Sestak Depo., at exhibit F); and Metz received in excess of $900,000. (Metz Depo., at 74.)
 {¶ 8} In September 2002, after the PEP had expired, Bill Reed, Senior Vice President of Energy Trading at AEPES, called a meeting of the energy traders to announce that a new PEP was in the final stages of approval and about to be rolled out. Reed offered certain details about the new plan, mainly that the payout ratio might be lower than the previous plan, and that the payouts might contain a stock component, as *Page 5 
well as a cash distribution. Reed also stated that they were having a very good year, had generated profits in excess of $300 million for the year-to-date, and were on a pace to have their second best year ever. Reed told appellants that they would be receiving payment in the near future. Reed also assured them that "all of you guys in this room are obviously going to be part of the next plan." (Shrewsbury Depo., 52-53; Sestak Depo., 38-40; Metz Depo., 77-78).
 {¶ 9} In early October 2002, AEPES terminated five gas traders for allegedly "providing inaccurate information to trading publications concerning trade settlement data." (Minutes from AEP Board of Directors' Meeting, Jeffrey D. Cross, Secretary, Oct. 10, 2002.) AEP's board of directors held a special meeting to address the firings, and to discuss risk management issues associated with the trading situation. The company reassessed its involvement in energy market trading, and decided to downsize its trading operation. Id. See, also, affidavit of Jeff Keifer, at ¶ 7.
 {¶ 10} The remaining AEPES energy traders, including appellants in this case, were instructed to reduce or exit their trading positions within a two hour timeframe. Sestak testified in his deposition that "the gas traders were pulled into a meeting I believe approximately two hours before the press statement came out, was due to come out stating that AEP was downsizing its trading activities, and we were instructed at that time to reduce our positions as much as possible before the statement came out." (Sestak Depo. 47-48; see, also, Shrewsbury Depo. 71-72; Metz Depo. 66; Dale Merkel, Press Release, AEP, Executives TellAnalysts that a Reduction in Trading is on Horizon for AEP Oct. 10, 2002.) *Page 6 
 {¶ 11} Several weeks after firing the five energy traders in October, AEPES terminated Shrewsbury and Sestak in a reduction in force, citing AEP's de-emphasizing of its energy trading operations. Also in November 2002, AEPES presented Metz with a retention offer that attempted to renegotiate Metz's contract, salary, and executive compensation, attempted to avoid paying him incentives for 2002, and offered him "retention payments" totaling $900,000 to induce him to remain employed through 2003. Metz never formally rejected the retention offer, but neither did he accept it. Metz left his position at AEPES in January 2003 and, after receiving $3,825,000 in cash and incentives for 2001, only received his base salary of $125,000 for his services to AEPES in 2002.
 {¶ 12} Shrewsbury and Sestak also received combined cash and incentives totaling more than $5 million in 2001, but after being terminated on November 21, 2002, they only received their base salaries of $125,000 each for the year 2002.
 {¶ 13} In a meeting of AEP's Board of Directors on December 11, 2002, the board was informed that AEP had officially terminated both the ICP and the PEP, and that management was recommending that the AEPES employees be included in AEP's standard compensation program. Management requested that the Human Resources Committee approve stock option grants for selected AEPES employees.
 {¶ 14} Despite the official termination of the plan some AEPES employees received something called "annual incentive compensation" and stock options for their services in 2002. For example, Bill Reed received an "annual incentive compensation" award of $3 million plus stock options estimated to be worth $281,160. *Page 7 
 {¶ 15} In granting AEP's motion for summary judgment, the trial court found that Shrewsbury and Sestak were terminated prior to the end of the year 2002, and that, as a result, under the terms of the ICP, they were not entitled to any payouts. (Decision and Entry Sustaining Defendants' Motion for Summary Judgment, filed Aug. 23, 2006.)
 {¶ 16} With regard to Metz, the trial court found that even though Metz was still employed through the end of 2002, no incentives had been awarded by the compensation committee. Therefore, Metz was not entitled to any disbursement, and he could not prevail on his fraud claim. Id. Regarding Metz's breach of contract claim, the trial court found that Metz breached his existing employment contract by rejecting AEPES's retention offer and by leaving the company. Id. at 12. Therefore, the trial court found that because he effectively resigned from his position voluntarily, he lost any rights to "payments that may be due and owing under the [ICP]." (Metz Employment Agreement, at 4.04.)
 {¶ 17} Collectively, appellants assign the following three errors for our review, all pertaining to the trial court granting summary judgment in favor of their former employer:
 I. The trial court erred in granting defendants' motion for summary judgment on plaintiffs' claims for an unpaid bonus by construing the evidence in favor of defendants.
 II. The trial court erred in granting defendant's' [sic] motion for summary judgment on plaintiff Metz's claim of breach of contract in that the court failed to consider all of plaintiff's evidence that it was AEP that breached the agreement.
 III. The trial court erred in granting defendants' motion for summary judgment on plaintiffs' fraud claims in that the trial court interpreted the terms of the ICP in a way most favorable to AEP. *Page 8 
 {¶ 18} For ease of discussion, we elect to address the assignments of error out of order.
 {¶ 19} The law governing motions for summary judgment is clearly set forth in Civ.R. 56. In Dresher v. Burt (1996), 75 Ohio St.3d 280, 293, the Supreme Court of Ohio clarified the burdens of both parties with respect to a motion for summary judgment:
 [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
 {¶ 20} In Ohio, these principles are embodied in a three-prong test taken directly out of Civ.R. 56: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp. RelationsBd. (1997), 78 Ohio St.3d 181, 183. *Page 9 
 {¶ 21} Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson PlumbingProducts, Inc. (2000), 530 U.S. 133, 120 S.Ct. 2097, 2110. This court follows these well-settled principles. See, e.g., Baer v. ScottsCo. (Dec. 6, 2001), Franklin App. No. 01AP-323.
 {¶ 22} Appellate review of summary judgment motions is de novo.Helton v. Scioto Cty. Bd. of Commrs. (1997), 123 Ohio App.3d 158, 162. When reviewing a trial court's decision granting summary judgment, we conduct an independent review of the record, and the appellate court "stands in the shoes of the trial court." Mergenthal v. Star BancCorp. (1997), 122 Ohio App.3d 100, 103.
 {¶ 23} We turn now to appellants' third assignment of error. With respect to their fraud claims, appellants assert that the trial court erred in construing the terms of the incentive compensation plan in favor of AEP.
 {¶ 24} In order to prevail on a claim of fraud, a plaintiff must prove that the defendant made: (1) a representation, or, where there is a duty to disclose, concealment of a fact; (2) material to the transaction at issue; (3) made falsely, with knowledge of its falsity, or with such recklessness regarding whether it is true or false that knowledge may be inferred; (4) with intent to induce reliance; (5) that plaintiff justifiably relied on defendant's statement(s) or concealment(s); and (6) damages proximately caused by that reliance. Williams v. Aetna Fin.Co. (1998), 83 Ohio St.3d 464, 475.
 {¶ 25} Appellants contend that AEP made false representations with the intent to keep appellants and other senior traders employed and generating profits, while at the same time AEP planned to cut appellants' compensation and to downsize the operation. *Page 10 
Appellants have not indicated a specific date when AEP management began planning to reduce their trading operations, although it appears from the record that most, if not all, of the relevant events took place in the fall of 2002. In September 2002, Bill Reed led a meeting in which he addressed the traders' concerns about the viability of the energy trading operations and the future of their employment. Reed made representations that AEPES was having its second best year ever, a new Phantom Equity Plan was ready to be rolled out, and payment of the current PEP would be distributed.
 {¶ 26} AEP takes the position that appellants could not reasonably rely on those representations because specific language in the ICP and the PEP reserved to AEP the right to alter the plan, and also reserved the right to terminate the plan at any time. Therefore, AEP argues that appellants were on notice that AEPES was not required to make distributions to appellants.
 {¶ 27} In resolving this question on a motion for summary judgment, we are mindful of our obligation to construe the evidence in the light most favorable to appellants. Thus, even if appellants were aware of the specific plan language that reserved to AEP the right to alter or terminate the plans, there is no reason why appellants should not have relied upon Bill Reed when he assured them payment was forthcoming.
 {¶ 28} In addition, AEP characterizes Bill Reed's statements to appellants as merely future predictions. AEP argues that a claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct. On the other hand, appellants argue the law provides an exception to that rule if the defendant makes a promise of future conduct with no intention of fulfilling it. Therefore, appellants claim that *Page 11 
a genuine issue of material fact exists as to whether AEP made the representations and promises in bad faith with no intention of keeping its promises.
 {¶ 29} AEP is correct in its assertion that a claim of fraud cannot be based on mere future predictions. Hancock v. Longo (Oct. 14, 1999), Franklin App. No. 98AP-1518. However, appellants are equally correct that an exception to the rule exists when at the time the defendant makes his representation, he has no intention of keeping his promise. Tibbs v. National Homes Constr. Corp. (1977),52 Ohio App.2d 281, 287.
 {¶ 30} Here, AEP claims that Bill Reed made his representations before the five traders were fired in early October for allegedly falsifying data and, therefore, Reed did not have knowledge that his predictions or promises would not come to fruition.
 {¶ 31} Reed called the meeting in which he made the statements in September, and the traders were not fired until early October. Nevertheless, we believe genuine issues of material fact exist with respect to when AEP first learned of the alleged misconduct that led to the firings, when they began making plans to downsize, and when they began making plans to eliminate bonus payments for 2002. We note that as early as January 23, 2002, the Human Resources Committee reported to the Board of Directors concerning employees who had received bonus compensation in excess of $1 million for the previous year. (Appellants were in this group.) There ensued a discussion concerning the need to ensure that incentive compensation did not exceed "reasonable and appropriate levels and to take a conservative approach on the methodology for incentive compensation pool funding." (January 23, 2002 Minutes of the Board of Directors, at 25.) These statements support an inference that AEP, through Bill Reed, made representations to appellants to induce them to keep on generating profits for *Page 12 
AEPES while in reality they were planning to drastically reduce appellants' compensation. Thus, the timing of the actions by AEP management reasonably leads to the inference that the representations were intentionally false. Actual resolution of that issue, however, must await trial.
 {¶ 32} We agree with appellants that a genuine issue of material fact remains as to whether the timing of AEP's actions both in making representations and in terminating Shrewsbury and Sestak can be construed as bad faith and intent to deny appellants payments they had been promised would be forthcoming. Whether appellants can prevail on their fraud claims is an issue for the trier of fact.
 {¶ 33} In my opinion, the third assignment of error should be sustained. However, in light of Judge Bryant's and Judge Brown's separate opinions, the third assignment of error is overruled.
 {¶ 34} In their second assignment of error, Metz contends that the trial court erred in concluding that he breached the contract and failed to consider evidence that in fact AEP breached the contract. When AEPES presented Metz with the "retention offer" in November 2002, Metz's present contract was still in full effect. The terms of the retention offer, which were inferior to the present terms, were meant by AEP to supersede Metz's present contract. Had Metz agreed to the new contract, he would have been bound by its terms. By neither accepting nor rejecting the new contract, Metz's present contract would have remained in effect. When it became clear to Metz that his 2002 bonus payments would not be forthcoming unless he agreed to the retention offer, Metz effectively resigned in January 2003, two months prior to the expiration of his present contract. *Page 13 
 {¶ 35} Metz is arguing an anticipatory breach, or more properly, an anticipatory repudiation of the contract by AEP. "An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." McDonald v.Bedford Datsun (1989), 59 Ohio App.3d 38, 40. The repudiation must be expressed in clear and unequivocal terms. Id. To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff. Id.
 {¶ 36} AEP takes the position that Metz rejected the new contract and voluntarily resigned from the company before distributions from the ICP were made and, therefore, Metz was not eligible to participate in the plan. Metz counters that the retention offer of November 8, 2002 contained inferior terms, was a breach of his contract, and was a thinly disguised way to compel Metz to work through 2003 in order to get fewer incentives than he should have received for work performed in 2002. Rather than agreeing to work beyond his present contract in order to receive his 2002 compensation, Metz left the company.
 {¶ 37} AEP's position is problematic for several reasons. First, Metz's employment contract provided that, unless he was terminated "for cause," he was entitled to all unpaid amounts under his compensation package, including the ICP and PEP. AEP does not claim that Metz was terminated for cause.
 {¶ 38} Second, although many terms are defined in the ICP, the term "earned" is not. Since the phrase "earned but unpaid" was not specifically defined in the plan itself, a determination of whether the incentives were in fact "earned" presents an ambiguity in the *Page 14 
contract. Interpretation of these ambiguous provisions cannot be made by a simple reference to the four corners of the agreements. Taken together, the terms of the ICP and the terms of Metz's employment contract present sufficient ambiguity so as to present a mixed question of law and fact that cannot be decided on a motion for summary judgment.Four Star Service, Inc. v. City of Akron (Oct. 27, 1999), Summit App. No. 19124.
 {¶ 39} Third, as discussed in connection with the fraud claims, Metz has presented evidence that AEP may have acted in bad faith in terminating the ICP in the manner in which it did. One reasonable inference from the evidence is that AEP may have terminated the plan to avoid paying Metz and the other appellants in order to retain a bonus pool of approximately $21.9 million (as of September 2002) which they then distributed to select employees.
 {¶ 40} Fourth, it is reasonable to infer that AEP breached its obligations under the contract by notifying Metz in the letter of November 8, 2002, that they would not fulfill their obligations under the current contract even though Metz was willing to work until the end of his term.
 {¶ 41} For all these reasons, I would find that genuine issues of material fact remain to be determined on Metz's breach of contract claim and because Judge Brown's separate opinion is in agreement, appellants' second assignment of error is sustained.
 {¶ 42} In their first assignment of error, appellants assert that the trial court erred in construing the evidence in favor of AEP. We have already determined that genuine issues of material fact exist with respect to the fraud claims and the breach of contract claim. Appellants remaining claims are for unjust enrichment and quantum meruit. *Page 15 
 {¶ 43} Under Ohio law, a plaintiff must prove the following elements to succeed in an action for unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant; (2) defendant's knowledge of the benefit; and (3) that the defendant's retention of the benefit conferred would be improper without rendering payment to plaintiff for same.Hummel v. Hummel (1938), 133 Ohio St. 520, 527.
 {¶ 44} Quantum meruit is similar in that it:
 is an equitable doctrine resting on the principle that an individual should not be permitted to unjustly enrich himself or herself at another's expense without making compensation or restitution for the benefits received. Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered. Quantum meruit implies a promise to pay the reasonable value of services rendered or materials supplied by one person for another where the services or materials are knowingly and voluntarily accepted by the recipient. The law presumes that the services or materials were given and received in the expectation of payment and implies a promise to pay what they are worth.
Beckler v. Bacon, Hamilton App. No. C-060228, 2007-Ohio-1319, at ¶ 13. (Citations omitted.)
 {¶ 45} As an initial matter, AEP contends that appellants' unjust enrichment and quantum meruit claims fail because they were subject to the terms of the ICP. A plaintiff cannot prevail on an unjust enrichment claim in the absence of fraud or bad faith because recovery under an unjust enrichment claim is unavailable where the matters in dispute are governed by the terms of an express contract. Kucan v. General AmericanLife Ins. Co., Franklin App. No. 01AP-1099, 2002-Ohio-4290, at ¶ 39. Therefore, in the absence of *Page 16 
bad faith, AEP's argument would have merit. However, as we have previously discussed, genuine issues of material fact remain with regard to the issues of fraud and bad faith.
 {¶ 46} This court has held that, with regard to employee incentive plans, the employer must administer (or terminate) the plan in "good faith." See Thomas v. American Elec. Power Co., Inc. Franklin App. No. 03AP-1192, 2005-Ohio-1958. In Thomas, we interpreted a contractual clause nearly identical to the one sub judice. The employee incentive plan was designed to "motivate and retain key personnel" by providing "competitive, long-term, performance-driven incentive compensation and to provide a mechanism for such individuals to benefit" from their contributions to the profitability to AEP. There, the compensation committee had the same rights as under the clause at issue here, "to alter, amend, modify, revoke or terminate the Plan," so long as the amendment or alteration did not adversely affect the rights of any of the plan's participants. As was the case here, the trial court granted summary judgment for the employer. We found however, that summary judgment was inappropriate because issues of fact remained as to whether AEP administered and terminated the plan in "good faith." See Id. (quoting Hainline v. General Motors Corp. (C.A.6, 1971), 444 F.2d 1250,1257 ("[W]hen an executive committee is vested with the authority to terminate rights in a bonus, pension, or other similar plan, upon a factual determination such as voluntariness, it is bound to exercise its authority honestly and in good faith").
 {¶ 47} In this case, it is clear that at one point, the appellants were entitled to distributions from AEPES's incentive plans. It is also clear that AEPES was never dissatisfied with the quality or productivity of appellants' work. As late as September *Page 17 
2002, AEP was telling appellants that they were on track to have the second highest year ever, and that they would be receiving payment in the near future.
 {¶ 48} It is not clear, however, when and why AEPES decided to terminate the compensation plans, and why they decided not to make distributions to these employees. The record does demonstrate that the energy trading market was in a decline in 2002; however, this did not prevent AEPES from distributing a bonus pool of approximately $21.9 million consisting of monies earned in the first three quarters of 2002 to certain select employees but not to appellants. AEP also granted large stock options to high ranking employees as part of its long-term incentive plan for senior management. Appellants worked for AEPES for most of 2002. The record shows that AEPES was profitable in 2002 — perhaps not as profitable as the previous year, but nonetheless profitable and able to pay incentives to selected employees. Appellants conferred a benefit upon AEPES by generating approximately $60 million in profit from their efforts alone. AEPES does not dispute this, nor do they dispute knowledge of receiving that benefit.
 {¶ 49} The fact that a new PEP was implemented January 3, 2003 could lead to the inference that the timing was an attempt to cut appellants out of their compensation, and to enrich themselves at appellants' expense. I believe it cannot be determined from the record whether AEP discontinued the ICP or refused to roll out the new PEP in good faith. The timing of their acts can be construed as evidence of bad faith. Therefore, I believe that a genuine issue of material fact exists as to whether AEP was acting in good faith. I believe summary judgment on appellants' claims of unjust enrichment and quantum meruit was inappropriate. Appellants argue that the trial court arrived at its *Page 18 
determination that they were not entitled to distributions under the various incentive plans by construing the evidence in a light more favorable to AEP. I agree, the dissenters do not.
 {¶ 50} AEP makes the additional argument that because Shrewsbury and Sestak were terminated prior to the end of 2002, they did not fulfill the condition precedent of the plan, which required that employees be employed by AEPES in order to remain eligible. Not surprisingly, appellants view the facts differently. Appellants contend that AEP was fully aware of the requirement that a participant be employed at the end of the year to be eligible for a bonus, and consequently they terminated Sestak and Shrewsbury in late November as a way to keep Sestak and Shrewsbury working as long as possible to generate profits, but to avoid paying bonuses by having them employed at the end of the year. Under AEP's reasoning, the company could keep traders on until December 30 of a given year, terminate them, and refuse to pay them any bonus for the profits they generated for all but one day of the year. At oral argument, counsel for AEP espoused this position. I believe such a construction of the agreement completely disregards any duty of good faith and fair dealing implied in the agreement.
 {¶ 51} Cases interpreting such clauses in bonus or commission agreements have come to differing conclusions as to enforceability. InMcKelvey v. Spitzer Motor Center, Inc. (1988), 46 Ohio App.3d 75, the Cuyahoga County Court of Appeals examined a commission plan that, among other things, required an employee to remain in the company's employ until the actual payment date. The plaintiff had worked the entire year but had resigned before the year end audit was performed and payments made. The court held that the company's plan which contained an offer to pay a bonus based on *Page 19 
their annual net profit gave rise to an obligation to pay the bonus irrespective of the date when the employer decided to make the bonus payable.
 {¶ 52} Similarly, in Wall v. Pizza Outlet, L.P., Stark App. No. 2001CA00376, the Fifth District Court of Appeals held that it was inequitable to forfeit an employee's share of the employee bonus plan where the only condition not met was employment at the time the bonus was paid.
 {¶ 53} On the other hand, in Kucan, this court came to the opposite conclusion, and held that an incentive plan that stated workers would not be entitled to payment if they voluntarily discontinued their employment or were terminated was enforceable.
 {¶ 54} In summary, some courts have followed a strict construction interpretation of the language in bonus-type plans, while other courts have looked to equitable principles to avoid inequitable results.
 {¶ 55} This court has found language granting complete discretion to the employer as to plan administration to be illusory. In Quesnell v.Bank One Corp. (Apr. 4, 2002), Franklin App. No. 01AP-792, this court held that language in a written incentive plan reserved the right to the employer to modify, amend, or terminate the plan at any time and the right to disavow any obligation to pay any participant an incentive award rendered the contract illusory. Accordingly, the case was remanded for consideration of the plaintiff's unjust enrichment claim. InKulas v. Bank One Trust Co., N.A., Franklin App. No. 01AP-1290, 2002-Ohio-5002, the plaintiff's claims under a contract theory failed as the contracts at issue vested unfettered discretion in the employer to determine the nature or extent of its performance. As such, the incentive plans were unenforceable as a matter of law. *Page 20 
 {¶ 56} The plan language at issue here is distinguishable from that inQuesnell. Here, the plan did not allow AEP unlimited discretion to terminate the plan at any time up to actual payout of the awards. However, I believe there is an ambiguity in the plan language of section 5.2 ("Except for a Participant who retires, becomes permanently and totally disabled or dies, a Participant must be an employee of the Company or of [AEPES] on the last day of the Plan Year to earn an Incentive Award"), and section 7.1 ("The Compensation Committee shall have the right, authority and power to alter, amend, modify, revoke or terminate the Plan; provided that no amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to earned but unpaid Incentive Compensation Awards"), with respect to the meaning of the term "earned." (Emphasis added.)
 {¶ 57} In Choi v. AEP Energy Services, Inc. (C.A.9, 2005), 132 Fed.Appx. 699, the Ninth Circuit Court of Appeals was called upon to apply Ohio law to interpret an incentive compensation plan like the one at issue in this case. The court held, as a matter of law, that the AEP plan established several conditions that had to be satisfied before a bonus was "earned" within the meaning of the plan. An employee had to remain employed at the end of the plan year, the bonus pool must be calculated, the president had to recommend individual bonus amounts, and the compensation committee had to act upon the president's recommendations. Finding that there was no dispute as to whether the plaintiffs had satisfied any of the conditions, the court held the preconditions were enforceable as part of a valid contract.
 {¶ 58} I respectfully disagree with the conclusion of the Ninth Circuit. As noted previously, the plan never defined the term "earned," and there exists an ambiguity as to *Page 21 
the meaning of the term. Since AEP reserved to itself the right to interpret the plan (see Section 6.1) they submitted the affidavit of Jeff Keifer, manager for Human Relations for AEPES, for the proposition that an incentive award was not "earned" within the meaning of the plan until the compensation committee acted on the president's recommendation for a particular participant. However, as discussed in connection with appellants' other claims, the plan is unenforceable if the drafter has violated the duty of good faith and fair dealing implied in every contract to allow an employer to retain incentives that were earned during the time the contract was in force, but not yet paid over to the employees. We believe the Ninth Circuit ignored the requirements of good faith, went beyond the legal issues surrounding the contract, and weighed the evidence in determining whether the plaintiffs' incentives had been earned during the time the contract was in force. Moreover, under Civ.R. 56, we are required to draw all reasonable inferences in favor of the nonmoving party, giving credence to the evidence favoring the nonmovant, as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves, at 151. The human relations manager is hardly a disinterested witness.
 {¶ 59} For all these reasons, I believe appellants' first assignment of error should be sustained. However, in light of Judge Bryant's and Judge Brown's separate opinions, it is overruled.
 {¶ 60} Pursuant to the three opinions of this court, appellants' first and third assignments of error are overruled, their second assignment of error is sustained, the *Page 22 
judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with these opinions.
Judgment affirmed in part and reversed in part and causeremanded.
[1] Not all claims applied to all appellants.