BROWN, J., concurs in part and dissents in part.
BRYANT, J., writing separately.
 {¶ 61} Being unable to agree with the lead opinion, I write sepatately.
 {¶ 62} Appellants' complaint asserts both a fraud claim, as well as a quasi-contract claim premised on bad faith. Because they are separate claims, I address fraud separately from bad faith. To prevail on their fraud claim, appellants must prove appellees knowingly made a false and material representation with intent to induce reliance. Williams v.Aetna Fin. Co. (1998), 83 Ohio St.3d 464. In that context, appellants claim AEP falsely represented AEP's profits and bonuses in an attempt to retain appellants, along with appellants' continuing efforts to generate profits, until AEP arbitrarily decided to downsize its trading operation.
 {¶ 63} Appellants attempt to support their contention with evidence of a meeting they had with Bill Reed, Senior Vice President — Energy Trading, in late August or early September 2002. Appellants contend, per the allegations of their amended complaint, that in the meeting Reed falsely represented: (1) AEP was on pace to have its second best year, thereby implying that bonuses under the Incentive Compensation Plan ("ICP") would be substantial; (2) a new Phantom Equity Plan ("PEP") soon would be rolled out; (3) payments under the existing PEP, that by its own terms expired in June 2002, would be forthcoming; and (4) "all of you guys here in this room are obviously going to be part of *Page 23 
the next plan." (Shrewsbury Depo. 52-53, 47-49; Sestak Depo. 38-40; Metz Depo. 77-78.) At the meeting, Reed further explained the incentives under the new PEP would probably consist more of stock rather than cash, and the payout ratio would be lower. Appellants contend that in reliance on Reed's representations they continued working and generating profits for AEP. The lead opinion concludes the timing of AEP's actions reasonably leads to the inference that Reed's representations were intentionally false. I disagree.
 {¶ 64} My difficulty with the lead opinion's conclusion rests in the lack of evidence to suggest Reed made the statements knowing them to be false. The evidence concerning events following appellants' meeting with Reed discloses that in early October 2002, five of AEP's gas traders admitted to falsely reporting their trading activities to industry publications. On or about October 8, 2002, the five individuals were terminated. Following AEP's public disclosure of the false report, its stock suffered a sharp decline. (Keifer Affidavit, ¶ 7.) Indeed, on October 10, 2002, AEP's stock price dropped 23 percent. (Press Release, October 11, 2002.)
 {¶ 65} Although the stock price subsequently rose again by 19.8 percent, AEP suffered a loss and lowered its annual profit forecast for 2002. Id. AEP's creditors pressured AEP to significantly scale back its trading operation and reduce its exposure to speculative energy trading markets. (Keifer Affidavit, ¶ 7.) Traders were instructed to flatten their positions, meaning eliminate market exposure, within two hours. Id. Due to the false trading reports and the ramifications from them, AEP terminated the ICP on December 10, 2002 pursuant to Section 7.1 of the ICP. Id. AEP also decided not to finalize, adopt or implement a new PEP. Id. at ¶ 7, 8. *Page 24 
 {¶ 66} In the face of AEP's evidence, appellants presented no evidence to support their fraud claim. Specifically, while Reed represented in September 2002 that AEP was on track to have its second best year, appellants presented no evidence indicating that AEP was not on pace at the time the representations were made in the third quarter of 2002. Further, to the extent appellants claim that Reed's comments implied substantial bonuses would be paid under the ICP, his statement is not a basis for a fraud claim: future predictions cannot form the basis of a fraud claim absent evidence that the defendant had no intention of keeping the promise at the time it was made. Tibbs v. National HomesConstr. Corp. (1977), 52 Ohio App.2d 281; Hancock v. Longo (Oct. 14, 1999), Franklin App. No. 98AP-1518. Appellants presented no such evidence.
 {¶ 67} Reed's representation that a new PEP would be rolled out soon likewise is insufficient, as it is a future prediction. Moreover, in explanation AEP submitted the affidavit of Jeff Keifer, which avers that due to the events of October 2002, AEP abandoned plans for a new PEP. (Keifer Affidavit, ¶ 9.) Not only do appellants fail to rebut Keifer's affidavit with any evidence to the contrary, but more significantly they fail to demonstrate that Reed had no intention of creating a new PEP at the time he made the statement. Indeed, the only evidence is that, prior to October, AEP was planning to implement a new PEP. Similarly, no evidence indicates that Reed's representation concerning appellants' participation in the new PEP was false at the time it was made. Finally, the representation concerning upcoming payments under the expired PEP was true. In September 2002, appellants received their share under the PEP that ran through June 30, 2002. Shrewsbury, Sestak and Metz received equity payments of $1.5 million, $1.5 million, and over $900,000, respectively. *Page 25 
 {¶ 68} To support its conclusion that summary judgment is inappropriate, the lead opinion cites to the minutes of a board of directors meeting from January 23, 2002. At that meeting, the Human Resources committee expressed concern to the Board of Directors about incentive compensation that exceeded one million dollars. As the lead opinion states, "There ensued a discussion concerning the need to ensure that incentive compensation did not exceed `reasonable and appropriate levels and to take a conservative approach on the methodology for incentive compensation pool funding.' "(Opinion, ¶ 31.) According to the lead opinion, "[t]hese statements support an inference that AEP, through Bill Reed, made representations to appellants to induce them to keep on generating profits * * * while in reality they were planning to drastically reduce appellants' compensation." Id.
 {¶ 69} The minutes of the January 2002 board meeting are insufficient to create a genuine issue of material fact about whether Reed knowingly made a false statement in late August or early September 2002. The minutes suggest only that appellants' incentive compensation should be reasonable and appropriate, not multi-million dollar payments. Had AEP's January 23, 2002 board meeting been the origin of its October actions, AEP would not have terminated the ICP; it would have reduced payments under the ICP. The minutes the lead opinion relies on do not support the inference appellants seek to draw.
 {¶ 70} Moreover, although the lead opinion acknowledges that appellants have not indicated a specific date when AEP decided to terminate the ICP, the lead opinion states "it is clear from the record that most, if not all of the relevant events took place in the fall of 2002." If most, or maybe all, of the relevant events took place in the fall of 2002, the *Page 26 
record contains only AEP's evidence that appellants were terminated after the news of false reporting, the resulting government investigations against AEP and its trading organization, and the pressure from AEP's creditors, all falling on the heels of the Enron scandal.
 {¶ 71} To infer, as appellants suggest, that the January minutes underpin the decision to terminate the ICP is not inference, but rather speculation. Appellants presented no evidence that Reed knew his statements were false at the time he made them. Indeed, appellant did not even depose Reed. Because appellants' evidence fails to support its claim of fraud, I dissent from the lead opinion's resolution of appellants' fraud claim.
 {¶ 72} Appellants also assert quasi-contract claims. As the lead opinion accurately states, where an express contract exists concerning the services for which compensation is sought, a plaintiff cannot recover in quasi-contract absent fraud, bad faith, or illegality.Struna v. Ohio Lottery Comm'n, Franklin App. No. 03AP-787,2004-Ohio-5576; Kucan v. General Am. Life Ins. Co., Franklin App. No. 01AP-1099, 2002-Ohio-4290.
 {¶ 73} Under that standard, the first issue is whether the ICP is an express contract. During the time in question, Metz was employed under a written employment agreement that specifically incorporated the terms of the ICP. Kucan, supra. Metz therefore was subject to the terms of the ICP. Although Sestak's and Shrewsbury's employment was at-will, they were subject to the terms of the ICP by virtue of the unilateral contract that existed between the parties when they, understanding the terms of the ICP offer, continued their work at AEP. Hardwood v.Avaya (S.D.Ohio 2007), C2-05-828. *Page 27 
 {¶ 74} Accordingly, all three appellants were subject to the terms of the ICP. By its express terms, the ICP required a participant to be an employee on the last day of the plan year "to earn" an award. Section 5.2. The ICP, by its terms, further required the bonus pool to be established, the president to make recommendations, and the Compensation Committee to act on the president's recommendations. The ICP, according to its terms, could be terminated at any time prior to the end of the plan year, as long as the termination did not adversely affect earned but unpaid bonuses. On December 10, 2002, the Compensation Committee terminated the ICP.
 {¶ 75} In its summary judgment motion, AEP argued that appellants could not recover under their express contract because the specific pre-conditions the ICP imposed were not met. In essence, AEP asserted none of the appellants "earned" an award under the ICP. Ohio courts have enforced contractual conditions precedent even where doing so works a hardship on the employee. Ullmann v. May (1947), 147 Ohio St. 468;Kucan, supra. "A condition precedent is an event which must occur before the obligations in the contract become effective. If a condition precedent is not fulfilled, a party is excused from performing its duty promised under the contract." Moody v. Ohio Rehab. Servs. Comm'n, Franklin App. No. 02AP-596, 2002-Ohio-6965, ¶ 9. (Citation omitted.)
 {¶ 76} The Ninth Circuit analyzed in Choi v. AEP Energy Services,Inc. (C.A.9., 2005), 132 Fed.Appx. 699, precisely the same ICP provisions at issue here. Choi held that AEP's plan established several conditions that must be fulfilled before a bonus could be "earned": an employee must be an employee at the end of the plan year or December 31, the bonus pool must be calculated, the president must recommend bonus amounts and the Compensation Committee must act on the president's *Page 28 
recommendations. Id. Because none of those conditions was fulfilled, theChoi plaintiffs were not entitled to an award under the ICP. Id.
 {¶ 77} The same facts occur here, leading to the same result. Shrewsbury and Sestak unquestionably were not employed at the end of the plan year, as they were terminated over one month prior to December 31, 2002. The bonus pool was not yet calculated, and the president had not yet made any recommendations upon which the Compensation Committee could act. For those reasons, Shrewsbury and Sestak did not "earn" an award under the terms of the ICP. Kucan, supra (enforcing a pre-condition requiring an employee to be employed through March 31, 2000 to be eligible for an incentive payment, and concluding that, because the employee resigned in January, he was not entitled to any payment). Although Metz was employed at the end of the plan year, the remaining pre-conditions were not satisfied.
 {¶ 78} Were the noted terms not enough to support the trial court's decision granting summary judgment to AEP, the ICP's payments were, by its terms, discretionary. See Thomas v. American Elec. Power Co.,Inc., Franklin App. No. 03AP-1192, 2005-Ohio-1958. The Compensation Committee could accept or modify the president's recommendations, and the committee's decision was final. Discretionary bonuses generally do not form the basis for a breach of contract claim. Mazzitti v. GardenCity Group, Inc., Franklin App. No. 06AP-850, 2007-Ohio-___; Frank v.Nationwide Mut. Ins. Co., Franklin App. No. 02AP-1336, 2003-Ohio-4684. Indeed, the very notion of a "bonus" or "incentive award" implies that the employer determines under what circumstances payment will be made. To hold otherwise on the facts of this case turns discretionary compensation into a guaranteed salary. *Page 29 
 {¶ 79} The lead opinion cites McKelvey v. Spitzer Motor Center (1988),46 Ohio App.3d 75 and Wall v. Pizza Outlet, L.P., Stark App. No. 2001CA00376, 2002-Ohio-3483, and states that some courts look to the equitable principles to avoid unjust results. Neither case is persuasive. Appellants Sestak and Shrewsbury, unlike the plaintiffs inMcKelvey and Wall, did not work the entire plan year subject of the compensation award they seek. Moreover, to the extent appellants seek to insert an element of good faith and fair dealing into the terms of the ICP, their efforts fail for two reasons. Initially, Shrewsbury and Sestak did not sue for breach of contract with AEP; they seek to recover in fraud and quantum meruit. Secondly, appellants presented no evidence that AEP lacked good faith in exercising the discretion afforded it under the ICP. See Interstate Gas Supply, Inc. v. Calex Corp., Franklin App. No. 04AP-980, 2006-Ohio-638, ¶ 97 (defining good faith as a "compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties"); see, also, Hamilton Ins. Serv., Inc. v. Nationwide Ins.Cos. (1999), 86 Ohio St.3d 270 (determining that there can be no implied covenant in a contract in relation to any matter specifically covered by the written terms of the contract itself).
 {¶ 80} Due to the express terms of the ICP, appellants cannot recover in quasi-contract absent evidence of bad faith or fraud. As noted, appellants fail to demonstrate fraud. While appellants attempt to rely on the same evidence used in connection with their fraud claims to support an inference of bad faith in their quasi-contract claim, the argument fails for the same reasons the fraud claim fails. *Page 30 
 {¶ 81} Bad faith is defined as "a dishonest purpose, moral obliquity conscious wrongdoing [or] breach of a known duty through some ulterior motive or ill will partaking in the nature of fraud." Lane v. CincinnatiCivil Serv. Comm'n (June 25, 1997), Hamilton App. No. C-960698, citingKalain v. Smith (1986), 25 Ohio St.3d 157.
 {¶ 82} In support of their claim that AEP acted in bad faith in terminating the ICP, not paying any bonuses under it, and not rolling out a new PEP, appellants point to the following "evidence": (1) AEP had the money to pay incentive awards; (2) AEP paid "retention" and "performance awards" to other high level employees out of the ICP's bonus pool; (3) AEP funded its "nefarious reduction in force" with the bonus pool; and (4) AEP "arrogantly" implemented a new ICP in January 2003.
 {¶ 83} AEP did not contend it could not afford payment under the ICP. While AEP paid certain employees out of the bonus pool, payment alone does not create an inference of dishonest purpose or ill will towardappellants. If it did, the discretionary aspects of the ICP would be vitiated. Rather, the only evidence in the record demonstrates that AEP significantly scaled back its trading activities as a direct result of false reporting, resulting investigations, external pressure from creditors, and market conditions. While appellants undoubtedly felt the brunt of AEP's business decisions, those decisions do not rise to the level of bad faith. For the same reasons, AEP's failure to create a new PEP in the last quarter of 2002 does not provide a basis for a claim. Because appellants' evidence cannot reasonably be construed in favor of finding bad faith, or fraud, appellants cannot recover under a theory of unjust enrichment or quantum meruit. *Page 31 
 {¶ 84} Lastly, I disagree with the lead opinion's analysis of Metz's claim concerning the retention letter. The lead opinion characterizes Metz's argument as "an anticipatory repudiation of the contract by AEP" because AEP's November 8, 2002 letter to Metz offered terms inferior to Metz's then current contract in effect until March 2003; Metz claims it was a way to compel Metz to work through 2003 but receive fewer incentives than he should have received for work performed in 2002. (Opinion, ¶ 35.) The lead opinion concludes it is "reasonable to infer" that AEP breached its obligations by sending Metz the letter. Id. at ¶ 39. Even at the summary judgment stage, however, contract repudiation must be expressed in clear and unequivocal terms. McDonald v. BedfordDatsun (1989), 59 Ohio App.3d 38.
 {¶ 85} Significantly, Metz's employment agreement states that either party may terminate the agreement for any reason upon 14 days written notice. Despite that provision, Metz stated in his deposition multiple times that AEP was trying to retain him. Indeed, Metz received his "retention offer" on November 8, 2002 but did not resign from AEP until the end of January 2003 when he accepted work at Citadel Investment Group. Metz admitted that he did not officially decline AEP's offer; nor did he formally accept it. (Metz Depo. 103, 107.) AEP nonetheless did not terminate Metz, but continued to employ and pay him. Because Metz did not set forth evidence that AEP unequivocally repudiated its obligations under Metz's employment agreement, but rather only evidence that AEP continued to honor its obligations under its contract with Metz, Metz's anticipatory breach of contract claim fails as a matter of law. *Page 32 
 {¶ 86} Because the trial court properly granted summary judgment to AEP, I would overrule appellants' first, second, and third assignments of error and affirm the judgment of the trial court. BROWN, J., writing separately.
 {¶ 87} I write separately to emphasize a few points with regard to appellant Metz's breach of contract claim raised in the second assignment of error. I agree with the lead opinion that the letter to Metz from AEP, dated November 8, 2002, was a retention offer that contained inferior terms to his then current employment agreement. The letter itself creates a genuine issue of material fact whether AEP expressly repudiated its obligations under Metz's employment agreement in effect through March 2003. Although Metz resigned from AEP January 31, 2003, it is reasonable to infer that Metz never officially rejected the retention offer because of his concern that AEP would either fail to exercise good faith in matters pertaining to him that were discretionary or would simply terminate him. There is a question of fact whether AEP acted in good faith, generally, in connection with Metz's employment agreement and corresponding retention offer. Thomas v. American Elec.Power Co., Inc., Franklin App. No. 03AP-1192, 2005-Ohio-1958. For those reasons, I agree with the lead opinion that Metz's breach of contract claim survives summary judgment. Accordingly, I concur with the lead opinion in sustaining appellant's second assignment of error.
 {¶ 88} As to the first and third assignments of error, I agree with the conclusion reached by Judge Bryant that these must be overruled. *Page 1