METZ et al., Appellant,

v.

AMERICAN ELECTRIC POWER CO., INC. et al., Appellees.

Metz et al., Appellees,

v.

American Electric Power Co., Inc.; Sestak et al., Appellants.

[Cite as *Metz v. Am. Elec. Power Co., Inc.,* 172 Ohio App.3d 800, 2007-Ohio-3520.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 06AP–1161 and 06AP–1166.

Decided July 10, 2007.

Porter, Wright, Morris & Arthur, L.L.P., Adele E. O'Conner, Robert W. Edmund, and Eric C. Myers, for appellees.

Law Offices of Russell A. Kelm, Russell A. Kelm and Joanne W. Detrick, for appellants.

## NUNC PRO TUNC OPINION[1]

TYACK, Judge.

{¶ 1} This is a consolidated appeal brought by three former executive employees of American Electric Power, Inc. (hereafter "AEPES"), a separately incorporated, wholly-owned subsidiary of American Electric Power Company (hereafter "AEP," and collectively "AEP"). The former employees brought claims against AEP for breach of contract, fraud, unjust enrichment, promissory estoppel, and quantum meruit after their former employer failed to pay incentives allegedly owed to them for services performed prior to their leaving AEPES in 2002/2003.[2] AEPES moved for summary judgment, and on August 23, 2006, the trial court

---

1. This opinion replaces, nunc pro tunc, the original opinion released on June 29, 2007, and is effective as of that date.

2. Not all claims applied to all appellants.

granted the motion as to all claims except one. Appellant James Shrewsbury dismissed the remaining claim with prejudice, and this appeal ensued.

{¶ 2} AEP, the parent corporation in this case, created AEPES in 1997 to be a wholesale marketing and trading subsidiary for natural gas and other related products and services. Since its emergence, the energy trading industry has been extremely profitable, resulting in certain energy traders and executives earning multimillion dollar bonuses.

{¶ 3} AEPES hired Shrewsbury and Joseph Sestak in the fall of 1997. Both Shrewsbury and Sestak had left their previous jobs to join AEPES as energy traders at an initial salary of $105,000 annually, plus incentives. It was understood that their base salary was to comprise only a small part of their compensation, and incentive packages would substantially bolster their annual base salaries. Shrewsbury and Sestak were each given employment contracts. Shrewsbury's contract expired on October 20, 1999, and he continued to work without a contract. Sestak signed a new contract in June 2000, which expired on May 31, 2002, and he also continued to work without a contract.

{¶ 4} AEPES hired appellant, Carey M. Metz in February 2001, after AEP acquired Metz's former employer, Houston Pipeline, from Enron. Metz assumed the position of director of energy marketing and trading at AEPES at an annual base salary of $125,000 plus incentives. Metz's two-year employment contract with AEPES was to run from March 2001 to March 2003.

{¶ 5} AEPES's incentive-compensation plan ("ICP" or "plan") was first adopted in 1997. This plan created an "annual bonus pool" comprised of 15 percent of AEPES's yearly pretax operating income. At the end of the year, AEPES distributed the proceeds from the plan to eligible employees. The amount of profits generated by the traders formed the basis of the allocation of the awards. However, the plan provided for the president of AEPES and the compensation committee to have complete control over how the funds were allocated. The ICP also contained language reserving the right to alter, amend, modify, revoke, or terminate the plan, with the proviso in section 7.1 specifying that "no amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to earned but unpaid Incentive Compensation awards." Notably, drafts of a potential new ICP circulating at the time of Shrewsbury's and Sestak's termination took this provision out. Also, nowhere in the plan is the term "earned" defined. Finally, section 5.2 of the plan required participants to be employed on the last day of the plan year (December 31st) to earn an incentive award.

{¶ 6} The ICP provided substantial payouts to its participants. For example, Shrewsbury received more than $1.5 million in 2002 from his services in 2001. Sestak received more than $500,000 from the plan during that same period.

Metz received a payout for 2001 of $2,800,000. After deciding to downsize the energy-trading aspect of its business, AEP made a decision in the last quarter of 2002 to terminate the ICP. Officially, the ICP was terminated December 10, 2002, by an act of the plan committee. Despite the termination of the official plan, management decided to allocate the approximate value of the bonus pool as of September 30, 2002 ($21.9 million) to various individuals. However, none of the appellants received payouts for the work they had performed in 2002, which generated large profits for AEP.

{¶ 7} In addition to the ICP, AEPES also offered a long-term incentive plan, known as the "Phantom Equity Plan" ("PEP"). The PEP's stated purpose was to "enhance shareholder value, and provide participants with an equity participation sufficient to attract, motivate and retain qualified employees." The PEP was also instituted in 1997 and terminated by its own terms in June 2002. Shrewsbury and Sestak each received $1,500,000 from the PEP, and Metz received in excess of $900,000.

{¶ 8} In September 2002, after the PEP had expired, Bill Reed, Senior Vice President of Energy Trading at AEPES, called a meeting of the energy traders to announce that a new PEP was in the final stages of approval and about to be rolled out. Reed offered certain details about the new plan, mainly that the payout ratio might be lower than the previous plan, and that the payouts might contain a stock component, as well as a cash distribution. Reed also stated that they were having a very good year, had generated profits in excess of $300 million for the year to date, and were on a pace to have their second best year ever. Reed told appellants that they would be receiving payment in the near future. Reed also assured them that "all of you guys in this room are obviously going to be part of the next plan."

{¶ 9} In early October 2002, AEPES terminated five gas traders for allegedly "providing inaccurate information to trading publications concerning trade settlement data." AEP's board of directors held a special meeting to address the firings and to discuss risk-management issues associated with the trading situation. The company reassessed its involvement in energy market trading and decided to downsize its trading operation.

{¶ 10} The remaining AEPES energy traders, including appellants in this case, were instructed to reduce or exit their trading positions within a two-hour time frame. Sestak testified in his deposition that "the gas traders were pulled into a meeting I believe approximately two hours before the press statement came out, was due to come out stating that AEP was downsizing its trading activities, and we were instructed at that time to reduce our positions as much as possible before the statement came out."

{¶ 11} Several weeks after firing the five energy traders in October, AEPES terminated Shrewsbury and Sestak in a reduction in force, citing AEP's de-emphasizing of its energy-trading operations. Also in November 2002, AEPES presented Metz with a retention offer that attempted to renegotiate Metz's contract, salary, and executive compensation, attempted to avoid paying him incentives for 2002, and offered him "retention payments" totaling $900,000 to induce him to remain employed through 2003. Metz never formally rejected the retention offer, but neither did he accept it. Metz left his position at AEPES in January 2003, and after receiving $3,825,000 in cash and incentives for 2001, received only his base salary of $125,000 for his services to AEPES in 2002.

{¶ 12} Shrewsbury and Sestak also received combined cash and incentives totaling more than $5 million in 2001, but after being terminated on November 21, 2002, they received only their base salaries of $125,000 each for the year 2002.

{¶ 13} In a meeting of AEP's board of directors on December 11, 2002, the board was informed that AEP had officially terminated both the ICP and the PEP and that management was recommending that the AEPES employees be included in AEP's standard compensation program. Management requested that the human resources committee approve stock-option grants for selected AEPES employees.

{¶ 14} Despite the official termination of the plan, some AEPES employees received something called "annual incentive compensation" and stock options for their services in 2002. For example, Bill Reed received an "annual incentive compensation" award of $3 million plus stock options estimated to be worth $281,160.

{¶ 15} In granting AEP's motion for summary judgment, the trial court found that Shrewsbury and Sestak were terminated prior to the end of the year 2002 and that, as a result, under the terms of the ICP, they were not entitled to any payouts.

{¶ 16} With regard to Metz, the trial court found that even though Metz was still employed through the end of 2002, no incentives had been awarded by the compensation committee. Therefore, Metz was not entitled to any disbursement, and he could not prevail on his fraud claim. Id. Regarding Metz's breach-of-contract claim, the trial court found that Metz had breached his existing employment contract by rejecting AEPES's retention offer and by leaving the company. Therefore, the trial court found that because he effectively resigned from his position voluntarily, he lost any rights to "payments that may be due and owing under the [ICP]."

{¶ 17} Collectively, appellants assign the following three errors for our review, all pertaining to the trial court's granting of summary judgment in favor of their former employer:

I.   The trial court erred in granting defendants' motion for summary judgment on plaintiffs' claims for an unpaid bonus by construing the evidence in favor of defendants.

II.   The trial court erred in granting defendant's' [sic] motion for summary judgment on plaintiff Metz's claim of breach of contract in that the court failed to consider all of plaintiff's evidence that it was AEP that breached the agreement.

III.   The trial court erred in granting defendants' motion for summary judgment on plaintiffs' fraud claims in that the trial court interpreted the terms of the ICP in a way most favorable to AEP.

{¶ 18} For ease of discussion, this opinion shall address the assignments of error out of order.

{¶ 19} The law governing motions for summary judgment is clearly set forth in Civ.R. 56.  In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, the Supreme Court of Ohio clarified the burdens of both parties with respect to a motion for summary judgment:

[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.  The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case.  Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims.  If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied.  However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

(Emphasis sic.)

{¶ 20} In Ohio, these principles are embodied in a three-pronged test taken directly out of Civ.R. 56:  (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the party against

whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343.

{¶ 21} Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.* (2000), 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105. This court follows these well-settled principles. See, e.g., *Baer v. Scotts Co.* (Dec. 6, 2001), Franklin App. No. 01AP-323, 2001 WL 1548759.

{¶ 22} Appellate review of summary judgment rulings is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. When reviewing a trial court's decision granting summary judgment, we conduct an independent review of the record, and the appellate court "stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383.

{¶ 23} Turning now to appellants' third assignment of error, appellants assert that the trial court erred in construing the terms of the ICP in favor of AEP.

{¶ 24} In order to prevail on a claim of fraud, a plaintiff must prove that the defendant made (1) a representation, or, where there is a duty to disclose, concealment of a fact, (2) material to the transaction at issue, (3) made falsely, with knowledge of its falsity, or with such recklessness regarding whether it is true or false that knowledge may be inferred, (4) with intent to induce reliance, (5) that plaintiff justifiably relied on defendant's statement(s) or concealment(s), and (6) damages proximately caused by that reliance. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859.

{¶ 25} Appellants contend that AEP made false representations with the intent to keep appellants and other senior traders employed and generating profits, while at the same time AEP planned to cut appellants' compensation and to downsize the operation. Appellants have not indicated a specific date when AEP management began planning to reduce its trading operations, although it appears from the record that most, if not all, of the relevant events took place in the fall of 2002. In September 2002, Bill Reed led a meeting in which he addressed the traders' concerns about the viability of the energy-trading operations and the future of their employment. Reed made representations that AEPES was having its second best year ever, a new Phantom Equity Plan was ready to be rolled out, and payment of the current PEP would be distributed.

{¶ 26} AEP takes the position that appellants could not reasonably rely on those representations because specific language in the ICP and the PEP reserved to AEP the right to alter the plan and also reserved the right to terminate the

plan at any time. Therefore, AEP argues that appellants were on notice that AEPES was not required to make distributions to appellants.

{¶ 27} In resolving this question on a motion for summary judgment, this author is mindful of the obligation to construe the evidence in the light most favorable to appellants. Thus, even if appellants were aware of the specific plan language that reserved to AEP the right to alter or terminate the plans, there is no reason why appellants should not have relied upon Bill Reed when he assured them that payment was forthcoming.

{¶ 28} In addition, AEP characterizes Bill Reed's statements to appellants as merely future predictions. AEP argues that a claim of fraud cannot be predicated upon promises or representations relating to future actions or conduct. On the other hand, appellants argue that the law provides an exception to that rule if the defendant makes a promise of future conduct with no intention of fulfilling it. Therefore, appellants claim that a genuine issue of material fact exists as to whether AEP made the representations and promises in bad faith with no intention of keeping its promises.

{¶ 29} AEP is correct in its assertion that a claim of fraud cannot be based on mere future predictions. *Hancock v. Longo* (Oct. 14, 1999), Franklin App. No. 98AP–1518, 1999 WL 816148. However, appellants are equally correct that an exception to the rule exists when at the time the defendant makes his representation, he has no intention of keeping his promise. *Tibbs v. Natl. Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 287, 6 O.O.3d 300, 369 N.E.2d 1218.

{¶ 30} Here, AEP claims that Bill Reed made his representations before the five traders were fired in early October for allegedly falsifying data, and therefore, Reed did not have knowledge that his predictions or promises would not come to fruition.

{¶ 31} Reed called the meeting in which he made the statements in September, and the traders were not fired until early October. Nevertheless, I believe that genuine issues of material fact exist with respect to when AEP first learned of the alleged misconduct that led to the firings, when it began making plans to downsize, and when it began making plans to eliminate bonus payments for 2002. As early as January 23, 2002, the human resources committee reported to the board of directors concerning employees who had received bonus compensation in excess of $1 million for the previous year. (Appellants were in this group.) There ensued a discussion concerning the need to ensure that incentive compensation did not exceed "reasonable and appropriate levels and to take a conservative approach on the methodology for incentive compensation pool funding." These statements support an inference that AEP, through Bill Reed, made representations to appellants to induce them to keep generating profits for AEPES while in reality, it was planning to drastically reduce appellants' compen-

sation. Thus, the timing of the actions by AEP management reasonably leads to the inference that the representations were intentionally false. Actual resolution of that issue, however, must await trial.

{¶ 32} I agree with appellants that a genuine issue of material fact remains as to whether the timing of AEP's actions both in making representations and in terminating Shrewsbury and Sestak can be construed as bad faith and intent to deny appellants payments that they had been promised would be forthcoming. Whether appellants can prevail on their fraud claims is an issue for the trier of fact.

{¶ 33} Therefore, in my opinion, the third assignment of error should be sustained. However, in light of Judge Bryant's and Judge Brown's separate opinions, the third assignment of error is overruled.

{¶ 34} In their second assignment of error, Metz contends that the trial court erred in concluding that he breached the contract and failed to consider evidence that in fact AEP had breached the contract. When AEPES presented Metz with the "retention offer" in November 2002, Metz's present contract was still in full effect. The terms of the retention offer, which were inferior to the present terms, were meant by AEP to supersede Metz's present contract. Had Metz agreed to the new contract, he would have been bound by its terms. By neither accepting nor rejecting the new contract, Metz's present contract would have remained in effect. When it became clear to Metz that his 2002 bonus payments would not be forthcoming unless he agreed to the retention offer, Metz effectively resigned in January 2003, two months prior to the expiration of his present contract.

{¶ 35} Metz is arguing an anticipatory breach, or more properly, an anticipatory repudiation of the contract by AEP. "An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." *McDonald v. Bedford Datsun* (1989), 59 Ohio App.3d 38, 40, 570 N.E.2d 299. The repudiation must be expressed in clear and unequivocal terms. Id. To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff. Id.

{¶ 36} AEP takes the position that Metz rejected the new contract and voluntarily resigned from the company before distributions from the ICP were made, and therefore, Metz was not eligible to participate in the plan. Metz counters that the retention offer of November 8, 2002, contained inferior terms, was a breach of his contract, and was a thinly disguised way to compel Metz to work through 2003 in order to get fewer incentives than he should have received

for work performed in 2002. Rather than agreeing to work beyond his present contract in order to receive his 2002 compensation, Metz left the company.

{¶ 37} AEP's position is problematic for several reasons. First, Metz's employment contract provided that, unless he was terminated "for cause," he was entitled to all unpaid amounts under his compensation package, including the ICP and PEP. AEP does not claim that Metz was terminated for cause.

{¶ 38} Second, although many terms are defined in the ICP, the term "earned" is not. Because the phrase "earned but unpaid" was not specifically defined in the plan itself, a determination of whether the incentives were in fact "earned" presents an ambiguity in the contract. Interpretation of these ambiguous provisions cannot be made by a simple reference to the four corners of the agreements. Taken together, the terms of the ICP and the terms of Metz's employment contract present sufficient ambiguity so as to present a mixed question of law and fact that cannot be decided on a motion for summary judgment. *Four Star Serv., Inc. v. Akron* (Oct. 27, 1999), Summit App. No. 19124, 1999 WL 980558.

{¶ 39} Third, as discussed in connection with the fraud claims, Metz has presented evidence that AEP may have acted in bad faith in terminating the ICP in the manner it did. One reasonable inference from the evidence is that AEP may have terminated the plan to avoid paying Metz and the other appellants in order to retain a bonus pool of approximately $21.9 million (as of September 2002), which they then distributed to select employees.

{¶ 40} Fourth, it is reasonable to infer that AEP breached its obligations under the contract by notifying Metz in the letter of November 8, 2002, that it would not fulfill its obligations under the current contract even though Metz was willing to work until the end of his term.

{¶ 41} For all these reasons, genuine issues of material fact remain to be determined on Metz's breach of contract claim, and because Judge Brown's separate opinion is in agreement, appellants' second assignment of error is sustained.

{¶ 42} In their first assignment of error, appellants assert that the trial court erred in construing the evidence in favor of AEP. Having already addressed the fraud claims and the breach-of-contract claim, appellants' remaining claims are for unjust enrichment and quantum meruit.

{¶ 43} Under Ohio law, a plaintiff must prove the following elements to succeed in an action for unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant, (2) defendant's knowledge of the benefit, and (3) improper retention of the benefit without the defendant's rendering of payment to plaintiff

for same. *Hummel v. Hummel* (1938), 133 Ohio St. 520, 527, 11 O.O. 221, 14 N.E.2d 923.

{¶ 44} Quantum meruit is similar:

"Quantum meruit is an equitable doctrine resting on the principle that an individual should not be permitted to unjustly enrich himself or herself at another's expense without making compensation or restitution for the benefits received." "*Quantum meruit* is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered." Quantum meruit implies a promise to pay the reasonable value of services rendered or materials supplied by one person for another when the services or materials are knowingly and voluntarily accepted by the recipient. The law presumes that the services or materials were given and received in the expectation of payment and implies a promise to pay what they are worth.

*Beckler v. Bacon*, 170 Ohio App.3d 612, 2007-Ohio-1319, 868 N.E.2d 716, at ¶ 13, quoting *Brose v. Bartlemay* (Apr. 16, 1997), 1st Dist. No. C-960423, and *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 55, 544 N.E.2d 920.

{¶ 45} As an initial matter, AEP contends that appellants' unjust-enrichment and quantum meruit claims fail because they were subject to the terms of the ICP. A plaintiff cannot prevail on an unjust-enrichment claim in the absence of fraud or bad faith because recovery under an unjust-enrichment claim is unavailable when the matters in dispute are governed by the terms of an express contract. *Kucan v. Gen. Am. Life Ins. Co.*, Franklin App. No. 01AP–1099, 2002-Ohio-4290, 2002 WL 1933377, at ¶ 39. Therefore, in the absence of bad faith, AEP's argument would have merit. However, as previously discussed, I believe that genuine issues of material fact remain with regard to the issues of fraud and bad faith.

{¶ 46} This court has held that with regard to employee incentive plans, the employer must administer (or terminate) the plan in "good faith." See *Thomas v. Am. Elec. Power Co., Inc.*, Franklin App. No. 03AP–1192, 2005-Ohio-1958, 2005 WL 977057. In *Thomas*, we interpreted a contractual clause nearly identical to the one sub judice. The employee-incentive plan was designed to "motivate and retain key personnel" by providing "competitive, long-term, performance-driven incentive compensation and to provide a mechanism for such individuals to benefit" from their contributions to the profitability to AEP. There, the compensation committee had the same rights as under the clause at issue here "to alter, amend, modify, revoke or terminate the Plan," so long as the amendment or alteration did not adversely affect the rights of any of the plan's participants. As was the case here, the trial court granted summary judgment for the employer.

We found, however, that summary judgment was inappropriate because issues of fact remained as to whether AEP administered and terminated the plan in "good faith." See id., quoting *Hainline v. Gen. Motors Corp.* (C.A.6, 1971), 444 F.2d 1250, 1257 ("[W]hen an executive committee is vested with the authority to terminate rights in a bonus, pension, or other similar plan, upon a factual determination such as voluntariness, it is bound to exercise its authority honestly and in good faith").

{¶ 47} In this case, it is clear that at one point, the appellants were entitled to distributions from AEPES's incentive plans. It is also clear that AEPES was never dissatisfied with the quality or productivity of appellants' work. As late as September 2002, AEP was telling appellants that they were on track to have the second highest year ever and that they would be receiving payment in the near future.

{¶ 48} It is not clear, however, when and why AEPES decided to terminate the compensation plans and why it decided not to make distributions to these employees. The record does demonstrate that the energy-trading market was in a decline in 2002; however, this did not prevent AEPES from distributing a bonus pool of approximately $21.9 million consisting of monies earned in the first three quarters of 2002 to certain select employees but not to appellants. AEP also granted large stock options to high-ranking employees as part of its long-term incentive plan for senior management. Appellants worked for AEPES for most of 2002. The record shows that AEPES was profitable in 2002—perhaps not as profitable as the previous year, but nonetheless profitable and able to pay incentives to selected employees. Appellants conferred a benefit upon AEPES by generating approximately $60 million in profit from their efforts alone. AEPES does not dispute this figure, nor does it dispute knowledge of receiving that benefit.

{¶ 49} The fact that a new PEP was implemented on January 3, 2003, could lead to the inference that the timing was an attempt to cut appellants out of their compensation and to enrich themselves at appellants' expense. I believe it cannot be determined from the record whether AEP discontinued the ICP or refused to roll out the new PEP in good faith. The timing of its acts can be construed as evidence of bad faith. Therefore, I believe that a genuine issue of material fact exists as to whether AEP was acting in good faith. I believe that summary judgment on appellants' claims of unjust enrichment and quantum meruit was inappropriate. Appellants argue that the trial court arrived at its determination that they were not entitled to distributions under the various incentive plans by construing the evidence in a light more favorable to AEP. I agree with appellants. However, the separate opinions express another view.

{¶ 50} AEP makes the additional argument that because Shrewsbury and Sestak were terminated prior to the end of 2002, they did not fulfill the condition precedent of the plan, which required that employees be employed by AEPES in order to remain eligible. Not surprisingly, appellants view the facts differently. Appellants contend that AEP was fully aware of the requirement that a participant be employed at the end of the year to be eligible for a bonus, and consequently, it terminated Sestak and Shrewsbury in late November as a way to keep Sestak and Shrewsbury working as long as possible to generate profits, but to avoid paying bonuses by having them employed at the end of the year. Under AEP's reasoning, the company could keep traders until December 30 of a given year, terminate them, and refuse to pay them any bonus for the profits they generated for all but one day of the year. At oral argument, counsel for AEP espoused this position. I believe that such a construction of the agreement completely disregards any duty of good faith and fair dealing implied in the agreement.

{¶ 51} Cases interpreting such clauses in bonus or commission agreements have come to differing conclusions as to enforceability. In *McKelvey v. Spitzer Motor Ctr., Inc.* (1988), 46 Ohio App.3d 75, 545 N.E.2d 1311, the Cuyahoga County Court of Appeals examined a commission plan that, among other things, required an employee to remain in the company's employ until the actual payment date. The plaintiff had worked the entire year but had resigned before the year-end audit was performed and payments made. The court held that the company's plan, which contained an offer to pay a bonus based on its annual net profit, gave rise to an obligation to pay the bonus irrespective of the date when the employer decided to make the bonus payable.

{¶ 52} Similarly, in *Wall v. Pizza Outlet, L.P.*, Stark App. No. 2001CA00376, 2002-Ohio-3483, 2002 WL 1467782, the Fifth District Court of Appeals held that it was inequitable to forfeit an employee's share of the employee bonus plan when the only condition not met was employment at the time the bonus was paid.

{¶ 53} On the other hand, in *Kucan*, 2002-Ohio-4290, 2002 WL 1933377, this court came to the opposite conclusion and held that an incentive plan that stated that workers would not be entitled to payment if they voluntarily discontinued their employment or were terminated was enforceable.

{¶ 54} In summary, some courts have followed a strict-construction interpretation of the language in bonus-type plans, while other courts have looked to equitable principles to avoid inequitable results.

{¶ 55} This court has held language granting complete discretion to the employer as to plan administration to be illusory. In *Quesnell v. Bank One Corp.* (Apr. 4, 2002), Franklin App. No. 01AP–792, 2002 WL 500506, this court held that language in a written incentive plan reserved the right to the employer to modify,

amend, or terminate the plan at any time and the right to disavow any obligation to pay any participant an incentive award rendered the contract illusory. Accordingly, the case was remanded for consideration of the plaintiff's unjust-enrichment claim. In *Kulas v. Bank One Trust Co., N.A.,* Franklin App. No. 01AP–1290, 2002-Ohio-5002, 2002 WL 31111832, the plaintiff's claims under a contract theory failed, as the contracts at issue vested unfettered discretion in the employer to determine the nature or extent of its performance. As such, the incentive plans were unenforceable as a matter of law.

{¶ 56} The plan language at issue here is distinguishable from that in *Quesnell.* Here, the plan did not allow AEP unlimited discretion to terminate the plan at any time up to actual payout of the awards. However, I believe there is an ambiguity in the plan language of Section 5.2 ("Except for a Participant who retires, becomes permanently and totally disabled or dies, a Participant must be an employee of the Company or of [AEPES] on the last day of the Plan Year to *earn* an Incentive Award"), and section 7.1 ("The Compensation Committee shall have the right, authority and power to alter, amend, modify, revoke or terminate the Plan; provided that no amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to *earned but unpaid* Incentive Compensation Awards") with respect to the meaning of the term "earned." (Emphasis added.)

{¶ 57} In *Choi v. AEP Energy Servs., Inc.* (C.A.9, 2005), 132 Fed.Appx. 699, the Ninth Circuit Court of Appeals was called upon to apply Ohio law to interpret an incentive-compensation plan like the one at issue in this case. The court held as a matter of law that the AEP plan established several conditions that had to be satisfied before a bonus was "earned" within the meaning of the plan. An employee had to remain employed at the end of the plan year, the bonus pool must be calculated, the president had to recommend individual bonus amounts, and the compensation committee had to act upon the president's recommendations. Concluding that there was no dispute as to whether the plaintiffs had satisfied any of the conditions, the court held that the preconditions were enforceable as part of a valid contract.

{¶ 58} I respectfully disagree with the conclusion of the Ninth Circuit. As noted previously, the plan never defined the term "earned," and there exists an ambiguity as to the meaning of the term. Since AEP reserved to itself the right to interpret the plan (see Section 6.1), it submitted the affidavit of Jeff Keifer, AEPES human relations manager, for the proposition that an incentive award was not "earned" within the meaning of the plan until the compensation committee acted on the president's recommendation for a particular participant. However, as discussed in connection with appellants' other claims, the plan is unenforceable if the drafter has violated the duty of good faith and fair dealing

implied in every contract to allow an employer to retain incentives that were earned during the time the contract was in force, but not yet paid to the employees. I believe the Ninth Circuit ignored the requirements of good faith, went beyond the legal issues surrounding the contract, and weighed the evidence in determining whether the plaintiffs' incentives had been earned during the time the contract was in force. Moreover, under Civ.R. 56, this court is required to draw all reasonable inferences in favor of the nonmoving party, giving credence to the evidence favoring the nonmovant, as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097, 147 L.Ed.2d 105. The human relations manager is hardly a disinterested witness.

{¶ 59} For all these reasons, I believe that appellants' first assignment of error should be sustained. However, in light of Judge Bryant's and Judge Brown's separate opinions, it is overruled.

{¶ 60} Pursuant to the three opinions of this court, appellants' first and third assignments of error are overruled, their second assignment of error is sustained, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with these opinions.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BRYANT, J., dissents.

BROWN, J., concurs in part and dissents in part.

BRYANT, Judge, dissenting.

{¶ 61} Being unable to agree with the lead opinion, I write separately.

{¶ 62} Appellants' complaint asserts both a fraud claim, as well as a quasi-contract claim premised on bad faith. Because they are separate claims, I address fraud separately from bad faith. To prevail on their fraud claim, appellants must prove that appellees knowingly made a false and material representation with intent to induce reliance. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859. In that context, appellants claim that AEP falsely represented AEP's profits and bonuses in an attempt to retain appellants, along with appellants' continuing efforts to generate profits, until AEP arbitrarily decided to downsize its trading operation.

{¶ 63} Appellants attempt to support their contention with evidence of a meeting they had with Bill Reed, Senior Vice President—Energy Trading, in late

August or early September 2002. Appellants contend, per the allegations of their amended complaint, that in the meeting, Reed falsely represented the following: (1) AEP was on pace to have its second best year, thereby implying that bonuses under the Incentive Compensation Plan ("ICP") would be substantial, (2) a new Phantom Equity Plan ("PEP") soon would be rolled out, (3) payments under the existing PEP, that by its own terms expired in June 2002, would be forthcoming, and (4) "all of you guys here in this room are obviously going to be part of the next plan." At the meeting, Reed further explained that the incentives under the new PEP would probably consist more of stock than cash, and the payout ratio would be lower. Appellants contend that in reliance on Reed's representations, they continued working and generating profits for AEP. The lead opinion concludes that the timing of AEP's actions reasonably leads to the inference that Reed's representations were intentionally false. I disagree.

{¶ 64} My difficulty with the lead opinion's conclusion rests in the lack of evidence to suggest Reed made the statements knowing them to be false. The evidence concerning events following appellants' meeting with Reed discloses that in early October 2002, five of AEP's gas traders had admitted to falsely reporting their trading activities to industry publications. On or about October 8, 2002, the five individuals were terminated. Following AEP's public disclosure of the false report, its stock suffered a sharp decline. Indeed, on October 10, 2002, AEP's stock price dropped 23 percent.

{¶ 65} Although the stock price subsequently rose again by 19.8 percent, AEP suffered a loss and lowered its annual profit forecast for 2002. AEP's creditors pressured AEP to significantly scale back its trading operation and reduce its exposure to speculative energy-trading markets. Traders were instructed to flatten their positions, meaning eliminate market exposure, within two hours. Due to the false trading reports and the ramifications from them, AEP terminated the ICP on December 10, 2002, pursuant to Section 7.1 of the ICP. AEP also decided not to finalize, adopt, or implement a new PEP.

{¶ 66} In the face of AEP's evidence, appellants presented no evidence to support their fraud claim. Specifically, while Reed represented in September 2002 that AEP was on track to have its second best year, appellants presented no evidence indicating that AEP was not on pace at the time the representations were made in the third quarter of 2002. Further, to the extent appellants claim that Reed's comments implied that substantial bonuses would be paid under the ICP, his statement is not a basis for a fraud claim: future predictions cannot form the basis of a fraud claim absent evidence that the defendant had no intention of keeping the promise at the time it was made. *Tibbs v. Natl. Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 6 O.O.3d 300, 369 N.E.2d 1218;

*Hancock v. Longo* (Oct. 14, 1999), Franklin App. No. 98AP–1518, 1999 WL 816148. Appellants presented no such evidence.

{¶ 67} Reed's representation that a new PEP would be rolled out soon likewise is insufficient, as it is a future prediction. Moreover, in explanation AEP submitted the affidavit of Jeff Keifer, which avers that due to the events of October 2002, AEP abandoned plans for a new PEP. Not only do appellants fail to rebut Keifer's affidavit with any evidence to the contrary, but more significantly, they fail to demonstrate that Reed had no intention of creating a new PEP at the time he made the statement. Indeed, the only evidence is that prior to October, AEP was planning to implement a new PEP. Similarly, no evidence indicates that Reed's representation concerning appellants' participation in the new PEP was false at the time it was made. Finally, the representation concerning upcoming payments under the expired PEP was true. In September 2002, appellants received their share under the PEP that ran through June 30, 2002. Shrewsbury, Sestak, and Metz received equity payments of $1.5 million, $1.5 million, and over $900,000, respectively.

{¶ 68} To support its conclusion that summary judgment is inappropriate, the lead opinion cites the minutes of a board of directors meeting from January 23, 2002. At that meeting, the human resources committee expressed concern to the board of directors about incentive compensation that exceeded one million dollars. As the lead opinion states, "There ensued a discussion concerning the need to ensure that incentive compensation did not exceed 'reasonable and appropriate levels and to take a conservative approach on the methodology for incentive compensation pool funding.' " According to the lead opinion, "[t]hese statements support an inference that AEP, through Bill Reed, made representations to appellants to induce them to keep on generating profits * * * while in reality, it was planning to drastically reduce appellants' compensation." Id.

{¶ 69} The minutes of the January 2002 board meeting are insufficient to create a genuine issue of material fact about whether Reed knowingly made a false statement in late August or early September 2002. The minutes suggest only that appellants' incentive compensation should be reasonable and appropriate, not multimillion dollar payments. Had AEP's January 23, 2002 board meeting been the origin of its October actions, AEP would not have terminated the ICP; it would have reduced payments under the ICP. The minutes the lead opinion relies on do not support the inference appellants seek to draw.

{¶ 70} Moreover, although the lead opinion acknowledges that appellants have not indicated a specific date when AEP decided to terminate the ICP, the lead opinion states, "[I]t appears from the record that most, if not all, of the relevant events took place in the fall of 2002." If most, or maybe all, of the relevant events took place in the fall of 2002, the record contains only AEP's evidence that

appellants were terminated after the news of false reporting, the resulting government investigations against AEP and its trading organization, and the pressure from AEP's creditors, all falling on the heels of the Enron scandal.

{¶ 71} To infer, as appellants suggest, that the January minutes underpin the decision to terminate the ICP is not inference, but rather speculation. Appellants presented no evidence that Reed knew his statements were false at the time he made them. Indeed, appellants did not even depose Reed. Because appellants' evidence fails to support its claim of fraud, I dissent from the lead opinion's resolution of appellants' fraud claim.

{¶ 72} Appellants also assert quasi-contract claims. As the lead opinion accurately states, where an express contract exists concerning the services for which compensation is sought, a plaintiff cannot recover in quasi-contract absent fraud, bad faith, or illegality. *Struna v. Ohio Lottery Comm.*, Franklin App. No. 03AP–787, 2004-Ohio-5576, 2004 WL 2361570; *Kucan v. Gen. Am. Life Ins. Co.*, Franklin App. No. 01AP–1099, 2002-Ohio-4290, 2002 WL 1933377.

{¶ 73} Under that standard, the first issue is whether the ICP is an express contract. During the time in question, Metz was employed under a written employment agreement that specifically incorporated the terms of the ICP. *Kucan*, 2002-Ohio-4290, 2002 WL 1933377. Metz therefore was subject to the terms of the ICP. Although Sestak's and Shrewsbury's employment was at will, they were subject to the terms of the ICP by virtue of the unilateral contract that existed between the parties when they, understanding the terms of the ICP offer, continued their work at AEP. *Harwood v. Avaya* (May 25, 2007), S.D.Ohio, E.D. No. C2–05–828, 2007 WL 1574116.

{¶ 74} Accordingly, all three appellants were subject to the terms of the ICP. By its express terms, the ICP required a participant to be an employee on the last day of the plan year "to earn" an award. Section 5.2. The ICP, by its terms, further required the bonus pool to be established, the president to make recommendations, and the compensation committee to act on the president's recommendations. The ICP, according to its terms, could be terminated at any time prior to the end of the plan year, as long as the termination did not adversely affect earned but unpaid bonuses. On December 10, 2002, the compensation committee terminated the ICP.

{¶ 75} In its summary judgment motion, AEP argued that appellants could not recover under their express contract because the specific preconditions that the ICP imposed were not met. In essence, AEP asserted that none of the appellants "earned" an award under the ICP. Ohio courts have enforced contractual conditions precedent even when doing so works a hardship on the employee. *Ullmann v. May* (1947), 147 Ohio St. 468, 34 O.O. 384, 72 N.E.2d 63; *Kucan,*

2002-Ohio-4290, 2002 WL 1933377. "A condition precedent is an event which must occur before the obligations in the contract become effective. If a condition precedent is not fulfilled, a party is excused from performing its duty promised under the contract." (Citation omitted.) *Moody v. Ohio Rehab. Servs. Comm.*, Franklin App. No. 02AP–596, 2002-Ohio-6965, 2002 WL 31819718, ¶ 9.

{¶ 76} The Ninth Circuit analyzed in *Choi v. AEP Energy Servs., Inc.* (C.A.9, 2005), 132 Fed.Appx. 699, precisely the same ICP provisions at issue here. *Choi* held that AEP's plan established several conditions that must be fulfilled before a bonus could be "earned": an employee must be an employee at the end of the plan year or December 31, the bonus pool must be calculated, the president must recommend bonus amounts, and the compensation committee must act on the president's recommendations. Id. Because none of those conditions were fulfilled, the *Choi* plaintiffs were not entitled to an award under the ICP. Id.

{¶ 77} The same facts occur here, leading to the same result. Shrewsbury and Sestak unquestionably were not employed at the end of the plan year, as they were terminated over one month prior to December 31, 2002. The bonus pool was not yet calculated, and the president had not yet made any recommendations upon which the compensation committee could act. For those reasons, Shrewsbury and Sestak did not "earn" an award under the terms of the ICP. *Kucan*, 2002-Ohio-4290, 2002 WL 1933377 (enforcing a precondition requiring an employee to be employed through March 31, 2000, to be eligible for an incentive payment and concluding that, because the employee resigned in January, he was not entitled to any payment). Although Metz was employed at the end of the plan year, the remaining preconditions were not satisfied.

{¶ 78} Were the noted terms not enough to support the trial court's decision granting summary judgment to AEP, the ICP's payments were, by its terms, discretionary. See *Thomas v. Am. Elec. Power Co., Inc.*, Franklin App. No. 03AP–1192, 2005-Ohio-1958, 2005 WL 977057. The compensation committee could accept or modify the president's recommendations, and the committee's decision was final. Discretionary bonuses generally do not form the basis for a breach-of-contract claim. *Mazzitti v. Garden City Group, Inc.*, Franklin App. No. 06AP–850, 2007-Ohio-3285, 2007 WL 1847688; *Frank v. Nationwide Mut. Ins. Co.*, Franklin App. No. 02AP–1336, 2003-Ohio-4684, 2003 WL 22054050. Indeed, the very notion of a "bonus" or "incentive award" implies that the employer determines under what circumstances payment will be made. To hold otherwise on the facts of this case turns discretionary compensation into a guaranteed salary.

{¶ 79} The lead opinion cites *McKelvey v. Spitzer Motor Ctr.* (1988), 46 Ohio App.3d 75, 545 N.E.2d 1311, and *Wall v. Pizza Outlet, L.P.*, Stark App. No. 2001CA00376, 2002-Ohio-3483, 2002 WL 1467782, and states that some courts

look to the equitable principles to avoid unjust results. Neither case is persuasive. Appellants Sestak and Shrewsbury, unlike the plaintiffs in *McKelvey* and *Wall*, did not work the entire plan year subject of the compensation award they seek. Moreover, to the extent appellants seek to insert an element of good faith and fair dealing into the terms of the ICP, their efforts fail for two reasons. Initially, Shrewsbury and Sestak did not sue for breach of contract with AEP; they seek to recover in fraud and quantum meruit. Secondly, appellants presented no evidence that AEP lacked good faith in exercising the discretion afforded it under the ICP. See *Interstate Gas Supply, Inc. v. Calex Corp.*, Franklin App. No. 04AP–980, 2006-Ohio-638, 2006 WL 328679, ¶ 97 (defining good faith as a "compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties"); see, also, *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 714 N.E.2d 898 (determining that there can be no implied covenant in a contract in relation to any matter specifically covered by the written terms of the contract itself).

{¶ 80} Due to the express terms of the ICP, appellants cannot recover in quasi-contract absent evidence of bad faith or fraud. As noted, appellants fail to demonstrate fraud. While appellants attempt to rely on the evidence used in connection with their fraud claims to support an inference of bad faith in their quasi-contract claim, the argument fails for the same reasons the fraud claim fails.

{¶ 81} Bad faith is defined as "a dishonest purpose, moral obliquity conscious wrongdoing [or] breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Lane v. Cincinnati Civ. Serv. Comm.* (1997), 122 Ohio App.3d 663, 702 N.E.2d 905, citing *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572.

{¶ 82} In support of their claim that AEP acted in bad faith in terminating the ICP, not paying any bonuses under it, and not rolling out a new PEP, appellants point to the following "evidence": (1) AEP had the money to pay incentive awards, (2) AEP paid "retention" and "performance awards" to other high-level employees out of the ICP's bonus pool, (3) AEP funded its "nefarious reduction in force" with the bonus pool, and (4) AEP "arrogantly" implemented a new ICP in January 2003.

{¶ 83} AEP did not contend that it could not afford payment under the ICP. While AEP paid certain employees out of the bonus pool, payment alone does not create an inference of dishonest purpose or ill will *toward appellants.* If it did, the discretionary aspects of the ICP would be vitiated. Rather, the only evidence in the record demonstrates that AEP significantly scaled back its trading activities as a direct result of false reporting, resulting investigations, external

pressure from creditors, and market conditions. While appellants undoubtedly felt the brunt of AEP's business decisions, those decisions do not rise to the level of bad faith. For the same reasons, AEP's failure to create a new PEP in the last quarter of 2002 does not provide a basis for a claim. Because appellants' evidence cannot reasonably be construed in favor of finding bad faith or fraud, appellants cannot recover under a theory of unjust enrichment or quantum meruit.

{¶ 84} Lastly, I disagree with the lead opinion's analysis of Metz's claim concerning the retention letter. The lead opinion characterizes Metz's argument as "an anticipatory repudiation of the contract by AEP" because AEP's November 8, 2002 letter to Metz offered terms inferior to Metz's then current contract in effect until March 2003; Metz claims it was a way to compel Metz to work through 2003 but receive fewer incentives than he should have received for work performed in 2002. The lead opinion concludes that it is "reasonable to infer" that AEP breached its obligations by sending Metz the letter. Id. at ¶ 40. Even at the summary judgment stage, however, contract repudiation must be expressed in clear and unequivocal terms. *McDonald v. Bedford Datsun* (1989), 59 Ohio App.3d 38, 570 N.E.2d 299.

{¶ 85} Significantly, Metz's employment agreement states that either party may terminate the agreement for any reason upon 14 days' written notice. Despite that provision, Metz stated in his deposition multiple times that AEP was trying to retain him. Indeed, Metz received his "retention offer" on November 8, 2002, but did not resign from AEP until the end of January 2003, when he accepted work at Citadel Investment Group. Metz admitted that he did not officially decline AEP's offer; nor did he formally accept it. AEP nonetheless did not terminate Metz, but continued to employ and pay him. Because Metz did not set forth evidence that AEP unequivocally repudiated its obligations under Metz's employment agreement, but rather only evidence that AEP continued to honor its obligations under its contract with Metz, Metz's anticipatory breach of contract claim fails as a matter of law.

{¶ 86} Because the trial court properly granted summary judgment to AEP, I would overrule appellants' first, second, and third assignments of error and affirm the judgment of the trial court.

BROWN, Judge, concurring in part and dissenting in part.

{¶ 87} I write separately to emphasize a few points with regard to appellant Metz's breach-of-contract claim raised in the second assignment of error. I agree with the lead opinion that the letter to Metz from AEP, dated November 8, 2002, was a retention offer that contained inferior terms to his then current employment agreement. The letter itself creates a genuine issue of material fact

whether AEP expressly repudiated its obligations under Metz's employment agreement in effect through March 2003. Although Metz resigned from AEP on January 31, 2003, it is reasonable to infer that Metz never officially rejected the retention offer because of his concern that AEP would either fail to exercise good faith in matters pertaining to him that were discretionary or would simply terminate him. There is a question of fact whether AEP acted in good faith, generally, in connection with Metz's employment agreement and corresponding retention offer. *Thomas v. Am. Elec. Power Co., Inc.*, Franklin App. No. 03AP–1192, 2005-Ohio-1958, 2005 WL 977057. For those reasons, I agree with the lead opinion that Metz's breach-of-contract claim survives summary judgment. Accordingly, I concur with the lead opinion in sustaining appellant's second assignment of error.

{¶ 88} As to the first and third assignments of error, I agree with the conclusion reached by Judge Bryant that these must be overruled.